# STATE OF MICHIGAN

# COURT OF APPEALS

HELEN KAYE MUELLER, Personal
Representative of the ESTATE OF TRAVIS LEE
PETERSON,

        Plaintiff-Appellant,

v

BRANNIGAN BROTHERS RESTAURANTS
AND TAVERNS LLC, AUSTIN SMITH,
DONALD SUTTLE JR, MARK MCCLAIN, and
SHAFEEK KANAVEH[1],

        Defendants-Appellees,

and

API EDEN ROCK INC,

        Defendant.

FOR PUBLICATION
April 3, 2018
9:05 A.M.

No. 335501
Ingham Circuit Court
LC No. 13-001379-NO

Before: RONAYNE KRAUSE, P.J., and FORT HOOD and O'BRIEN, JJ.

PER CURIAM.

Plaintiff Helen Kaye Mueller, the personal representative for the Estate of Travis Peterson, appeals by right after a jury trial and entry of a verdict partially in her favor. This matter arises out of the wrongful death of Peterson, who was killed after patronizing defendant Brannigan Brothers bar. After being ejected from the bar, Peterson was chased and physically beaten by bouncers who were then presently or previously employed by the bar. Notwithstanding the judgment partially in her favor, plaintiff appeals by right two evidentiary decisions and two partial grants of summary disposition. We affirm.

In broad strokes, with the exception of a few critical details, the facts are simple, undisputed, and tragic. Peterson was a business invitee, or more colloquially a patron, of the

---

[1] Also spelled "Kanazeh" in the lower court record.

-1-

restaurant or bar owned and operated by Brannigan Brothers Restaurants and Taverns LLC (Brannigan) in downtown Lansing, on January 1, 2012, in the early hours of the morning at approximately 2:00 a.m. Some manner of dispute occurred, and Peterson was asked to leave the premises. Peterson did so, and thereafter the individual defendants pursued Peterson and attacked him, inflicting injuries that caused his death. None of the above facts are seriously contested at this time, nor is it contested that the individual defendants had *some* kind of employment history with the bar. Rather, the only factual issues are whether any of the individual defendants were actually working for the bar at the time, were acting within the scope of their employment, or were the actual cause of Peterson's death. Brannigan was granted summary disposition on the grounds that all individual defendants were "off the clock" in one way or another.

Suttle was defaulted, Kanaveh settled partway through trial, the jury found McClain and Kanaveh both to have not been negligent, and the jury found Smith to have been negligent but not a proximate cause of Peterson's death. The jury found Peterson's own negligence to have been 20% responsible for his death and Suttle's negligence to have been 80% responsible for Peterson's death. Accordingly, the trial court entered judgment in favor of plaintiff and against Suttle, and a judgment of no cause of action against Smith and McClain.[2]

A grant or denial of summary disposition is reviewed de novo on the basis of the entire record to determine if the moving party is entitled to judgment as a matter of law. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). When reviewing a motion under MCR 2.116(C)(10), which tests the factual sufficiency of the complaint, this Court considers all evidence submitted by the parties in the light most favorable to the non-moving party and grants summary disposition only where the evidence fails to establish a genuine issue regarding any material fact. *Id*. at 120. A motion brought under MCR 2.116(C)(8) should be granted only where the complaint is so legally deficient that recovery would be impossible even if all well-pleaded facts were true and construed in the light most favorable to the non-moving party. *Id*. at 119. Only the pleadings may be considered when deciding a motion under MCR 2.116(C)(8). *Id*. at 119-120.

"The decision whether to admit evidence falls within a trial court's discretion and will be reversed only when there is an abuse of that discretion." *People v Duncan*, 494 Mich 713, 722; 835 NW2d 399 (2013). "A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes." *Id*. at 722-723. However, preliminary questions of law, including the interpretation and application of statutes and legal doctrines, are reviewed de novo, and the trial court necessarily commits an abuse of discretion if it makes an incorrect legal determination. *Id*. at 723; *Estes v Titus*, 481 Mich 573, 578-579; 751 NW2d 493 (2008). This Court also "reviews a trial court's rulings concerning the qualifications of proposed expert

---

[2] Suttle was independently convicted of second degree murder arising out of the same events that gave rise to the instant appeal. *People v Suttle*, unpublished opinion per curiam of the Court of Appeals, Docket No. 314773 (issued June 3, 2014).

witnesses to testify for an abuse of discretion." *Woodard v Custer*, 476 Mich 545, 557; 719 NW2d 842 (2006).

Plaintiff first argues that the trial court erred in granting summary disposition in favor of Brannigan. We note that plaintiff alleged several counts against Brannigan, and the parties fail to clearly distinguish the counts alleging vicarious liability from the counts alleging that Brannigan committed torts in its own right. In particular, plaintiff alleged that Brannigan was negligent in its hiring, retention, supervision, and training of its employees. This assertion does superficially resemble vicarious liability, insofar as the conduct of the employees is relevant. However, plaintiff correctly points out that the negligent hiring, retaining, training, or supervising of an employee can be a direct tort committed by the employer itself, not matter of vicarious liability. *Hersh v Kentfield Builders, Inc*, 385 Mich 410, 412-413; 189 NW2d 286 (1971). We will address the distinct issues separately.

Regarding vicarious liability, plaintiff fairly summarizes the legal principles: broadly, and in relevant part, an employer may be held liable for the tortious conduct of an employee so long as that conduct was "committed in the course and within the scope of the employee's employment," but *not* if the act was outside the employee's authority or committed for the employee's own personal purposes. *Bryant v Brannen*, 180 Mich App 87, 98; 446 NW2d 847 (1989). "While the issue of whether the employee was acting within the scope of his employment is generally for the trier of fact, the issue may be decided as a matter of law where it is clear that the employee was acting to accomplish some purpose of his own." *Id*.

Plaintiff accurately states that Suttle testified that he was working on the night of Peterson's beating. Critically, however, that is the *only* evidence plaintiff submits in support of Suttle having been an employee; on the very same page of his deposition, Suttle *also* testified that as of one minute after midnight, he was no longer an employee. Notably, he had not merely quit for the night, but in fact had been fired. He testified that by the time of the incident, he had left, and he returned to the bar only to retrieve his payment for the hours he had worked earlier. Plaintiff's argument that the trial court erred in finding no genuine question of fact that Suttle was not employed on the night of the incident is technically correct but essentially pettifoggery and substantively immaterial: even though he had been employed at some point on that evening, Suttle was no longer employed at the time he participated in chasing and beating Peterson. Consequently, the trial court correctly held that at the relevant time, Suttle was not in fact employed by Brannigan, so Brannigan could not be vicariously liable for Suttle's tortious misconduct. Brannigan argued in the trial court that there was no dispute that Kanaveh was not working on the night of the incident at all, and all of the testimony we have found supports that assertion. Plaintiff has not cited any evidence or advanced any argument to the contrary. Consequently, Brannigan could not be vicariously liable for any tortious misconduct engaged in by Kanaveh.

Brannigan concedes that Smith and McClain were employed and working at the time of the incident. Instead, Brannigan argues that they acted completely outside the scope of their employment by chasing an ejected patron down the street and beating him savagely. Plaintiff points out that Smith testified at his deposition that he had been a participant in the pursuit down the street strictly because he was attempting to protect McClain and break up the fight, and that he was therefore acting on behalf of Brannigan and within the scope of his employment, which

he believed specifically entailed protecting employees. However, it is critical that Smith's testimony was based his version of events, which was that Peterson had assaulted McClain and Smith was attempting to protect McClain or break up a fight, and he only punched Peterson because Peterson attacked him and he was unable to retreat. Consequently, this testimony does not support plaintiff's argument to the effect that Smith believed pursuing and assaulting Peterson would be conduct within the scope of his employment. Rather, Smith's testimony that he was acting within the scope of his employment is clearly dependent upon his interpretation of what occurred, which differs critically from plaintiff's interpretation of what occurred. Essentially, it is incompatibly conditional.

Otherwise, plaintiff makes no argument that we can find to the effect that chasing an ejected patron down the street, well off Brannigan's premises, for the purpose of committing a battery was authorized, was remotely similar to any authorized act, or was for any purpose whatsoever that could reasonably be believed to benefit Brannigan. The trial court's holding that Brannigan could not be held vicariously liable for the misconduct of the individual defendants was the only reasonable conclusion to draw on the evidence in this matter. Additionally, even if the trial court had erred in finding that Brannigan had no vicarious liability for the conduct of Smith and McClain, the jury's findings of no negligence as to McClain and no proximate cause as to Smith would render that finding irrelevant and harmless in any event.

However, neither the employees' present employment status nor their departure from the scope of their employment disposes of plaintiff's claims of negligent hiring, retention, training, or supervision. Furthermore, the fact that two of the individual defendants were not technically working for Brannigan at the time of the incident is also not dispositive: the gravamen of negligent hiring or retention is that the employer bears some responsibility for bringing an employee into contact with a member of the public despite knowledge that doing so was likely to end poorly. *Hersh*, 385 Mich at 412-413. In other words, it is not a tort dependent upon vicarious liability at all, but rather direct liability. Consequently, the fact that Brannigan allegedly should have known that the bouncers it hired would commit a grievous assault could *proximately* result in that assault, because it is the "but for" act that caused the bouncers and the patron to be in the same place at the same time.

Nevertheless, a claim of negligent hiring or retention requires actual or constructive knowledge by the employer that would make the *specific* wrongful conduct perpetrated by an employee predictable. See *Brown v Brown*, 478 Mich 545, 553-556; 739 NW2d 313 (2007). In particular, employers are not expected to anticipate that their employees will engage in criminal conduct without some particularized forewarning thereof. *Id*. at 555-556; *Hamed v Wayne Co*, 490 Mich 1, 12-15; 803 NW2d 237 (2011). Thus, lewd and crude commentary is not enough to put an employer on notice that an employee will commit a rape, although an actual threat to commit a rape would. *Brown*, 478 Mich at 555-556. A past history of generally aggressive and irresponsible behavior is not enough to put an employer on notice that the employee would engage in a violent sexual assault. *Hamed*, 490 Mich at 16. Knowledge of having actually committed another rape would justify anticipating that an employee would re-offend, if the employer had good reason to know of the prior crime. *Bradley v Stevens*, 329 Mich 556; 46 NW2d 382 (1951). Employers are not strictly liable for their employees' misconduct that goes beyond what would generate vicarious liability under respondeat superior. *Zsigo v Hurley Med Ctr*, 475 Mich 215, 226-227; 716 NW2d 220 (2006).

-4-

Plaintiff argues that Smith was well known to be violent and short-tempered, and he had been charged with assaulting a police officer. Strictly speaking, Smith had been convicted of *attempted* assault on a police officer pursuant to a plea on March 31, 2003, contemporaneously with an attempted unlawful use of a motor vehicle; an also-contemporaneous charge of larceny was dismissed, and Smith served a total of nine days. It was therefore a decade-old misdemeanor charge, and its predictive value to the incident at issue in this matter is consequently rather poor.

Plaintiff argues that Suttle had a prior manslaughter conviction, but provides no criminal docket sheet, and upon further analysis, the situation was considerably more bizarre. Suttle testified that in fact it was second-degree murder and the crime occurred when he was fifteen. Apparently, he was "playing with a firearm" that went off, and he was given the gun by his "girlfriend," who was 40 or 42 years old at the time and with whom he was having a sexual relationship, in some kind of "almost like a suicide-type deal." He testified that he entered a no contest plea "just pretty much to hush everything[, y]ou know, wouldn't have to get on the stand." Although a second-degree murder conviction sounds dramatic, the nature of the offense does not seem to easily lend itself to predicting the kind of pursuit and assault that occurred here, especially given the well-known propensity for teenagers to engage in dubious conduct they regret as adults.

Plaintiff argues that Kanaveh had a criminal history of fighting and theft. We have found no public record of any convictions. However, in his deposition Kanaveh did admit that he had been *charged* criminally on the basis of a fight somewhere in Novi in 2005 or 2006, which he described as "there was some sort of something going on where guys were arguing and fighting and I was punched and then I defended myself and punched a guy back and that was pretty much it from what I remember." He stated that although he was arrested, charged, and ultimately did go to court, the charge was dropped. He testified that he had also been arrested for attempting to steal a golf cart along with Smith "probably over ten years ago," but he did not recall what ultimately happened beyond paying restitution and presumably having his record expunged eventually. If Kanaveh even had a criminal record, nothing about it would suggest the kind of pursuit and assault that occurred here.

Plaintiff has not argued that McClain had any kind of criminal history insofar as we can find. We have reviewed McClain's deposition testimony, and there is no mention anywhere therein of any prior criminal history or history of violence otherwise. There is no public record of Mark McClain being listed as either an active or inactive offender. Obviously, there is no articulated negligent hiring claim based on McClain.

Consequently, the trial court properly disposed of plaintiff's claim for negligent hiring. Plaintiff's claims of negligent retention, negligent training, and negligent supervision are not necessarily disposed of merely because none of the individual defendants had particularly egregious histories prior to their hiring. However, those claims do still depend on the particular misconduct complained of being foreseeable. Taken at entirely face value, plaintiff argues that there were frequently fights at the bar, employees received no training, the owner was drunk and irresponsible, and the security staff had a tendency toward roughness and aggressiveness. We accept for the sake of argument that Brannigan's training and supervision were grossly incompetent or nonexistent. That would strongly suggest that sooner or later a patron was going

to get hurt fighting with the staff on-site or while being removed from the premises. That would still not predict security staff chasing an ejected patron down the street and beating him fatally. Such outrageous conduct and loss of self-control is such a radical departure from expected social norms that we very much doubt businesses commonly perceive a need to craft rules and training against that degree of blatantly obvious criminal misconduct.

Plaintiff finally argues that Brannigan should be held liable because its staff failed to ensure that Suttle and Peterson left the bar at different times. The only staff member plaintiff suggests should have done so is Pam Muzillo, who is not a named defendant. Additionally, plaintiff concedes that Suttle was a non-employee at the time, so this is essentially an argument that Brannigan had some obligation to control two unruly patrons after their ejection.

In any event, the cases upon which plaintiff relies are not helpful. In *Mills v White Castle Sys, Inc*, 167 Mich App 202; 421 NW2d 631 (1988), this Court held that it was possible for a restaurant to be negligent for failing to eject unruly patrons from its parking lot and failing to summon police upon request after those unruly patrons attacked other customers and were present for some considerable time. In *Marcelletti v Bathani*, 198 Mich App 655, 663-665; 500 NW2d 124 (1993), this Court noted the general rule that no one is under a duty to protect others from the conduct of third persons, but that a "special relationship" *could* give rise to such a duty in someone in a position of control to someone in a position of foreseeable danger, and that "proprietor-patron" had been recognized as such a "special relationship." In *Taylor v Laban*, 241 Mich App 449, 454-457; 616 NW2d 229 (2000), this Court mostly discussed licensees rather than invitees, but observed that a social host is not under any obligation to control guests beyond "refrain[ing] from willful and wanton misconduct that results in one guest injuring another guest," which is not established by a mere failure to act. Regarding invitees, the *Taylor* Court merely referenced *Williams v Cunningham Drug Stores, Inc*, 429 Mich 495, 502-503; 418 NW2d 381 (1988), in which our Supreme Court held that a merchant was not under a duty to provide armed guards and "any duty we might impose on defendant to protect his invitees from the criminal acts of third parties would be inevitably vague, given the nature of the harm involved." As discussed above, employers are generally not expected to anticipate criminal acts.

This issue is not as easily addressed as any of the parties suggest. However, the trial court ultimately reached the correct decision. Brannigan could not be held vicariously liable under respondeat superior because the individual defendants were either not working at the time of the incident or were wholly deviating from the scope and authority of that employment for their own purposes. Brannigan could not be held liable for negligent hiring because nothing in the individual defendants' backgrounds would have suggested any serious likelihood that they would commit the complained-of acts in this matter. Brannigan could not be held liable for negligent retention or supervision on these facts, because although it does appear that the bar was poorly run, the history of its internal issues would not predict this particular kind of misconduct. For analogous reasons, Brannigan cannot be held negligent simply because its staff ejected Suttle and Peterson at the same time, if indeed that actually occurred.

Plaintiff next argues that the trial court erred in dismissing her "concert of action" claim against the individual defendants. The parties all agree that "concert of action" was a viable cause of action in 1994. Under that "traditional theory," if a plaintiff "can establish that all defendants acted tortiously pursuant to a common design, they will all be held liable for the

entire result." *Abel v Eli Lilly and Co*, 418 Mich 311, 337-338; 343 NW2d 164 (1984). However, the parties dispute whether that cause of action survived the enactment of MCL 600.2956, an issue that appears not to have been explicitly determined in literally so many words by any published decision of the courts of this state. We hold that the issue has, however, been determined, albeit somewhat less cleanly stated, and that "concert of action" is in fact no longer a viable cause of action in Michigan.

Pursuant to MCL 600.2956:

Except as provided in section 6304, in an action based on tort or another legal theory seeking damages for personal injury, property damage, or wrongful death, the liability of each defendant for damages is several only and is not joint. However, this section does not abolish an employer's vicarious liability for an act or omission of the employer's employee.

The exception in MCL 600.6304 applies only in medical malpractice actions and is therefore irrelevant here, and otherwise MCL 600.6304(4) specifically states that liability "is several only and not joint." Furthermore, MCL 600.2957(1) provides:

In an action based on tort or another legal theory seeking damages for personal injury, property damage, or wrongful death, the liability of each person shall be allocated under this section by the trier of fact and, subject to section 6304, in direct proportion to the person's percentage of fault. In assessing percentages of fault under this subsection, the trier of fact shall consider the fault of each person, regardless of whether the person is, or could have been, named as a party to the action.

Plaintiff primarily advances the argument that by its own express terms, the statute exempts vicarious liability theories, and because vicarious liability was still an issue at the time the trial court decided the instant motion for summary disposition, concert of action was therefore still also a viable claim. However, that is unambiguously a misreading of both the statute and its entire framework, not to mention a very weak effort at bootstrapping, especially because a plain reading of the complaint shows that the concert of action count was alleged only against the individual defendants, not Brannigan. Vicarious liability is premised on agency and the traditional doctrine that a master is responsible for the actions of the master's servant even if the master was not personally at fault. *McClaine v Alger*, 150 Mich App 306, 316-317; 388 NW2d 349 (1986). It has nothing to do with joint liability and is a narrow exemption left by the Legislature. The significance is that Brannigan is not "off the hook" if any of its alleged employees were found liable for committing a tort while in the scope of their employment, *not* that all of the employees are liable if any of them are. The fact that there is an issue of *respondeat superior* in the case does not render the statute inapplicable to defendants who are not each others' employers.

Plaintiff argues that this Court's opinion of *Urbain v Bierling*, 301 Mich App 114, 132; 835 NW2d 455 (2013), establishes that "concert of action" remains a viable cause of action. Plaintiff accurately notes that this Court described what the claim entails, relying on *Abel*, and upheld the trial court's grant of summary disposition in favor of the defendants because the

plaintiff had failed to demonstrate an underlying tort rather than because concert of action was not a viable claim. However, this Court did so in the context of discussing the plaintiff's assertion that the trial court had erred in disposing of both a concert of action and a civil conspiracy claim, noting that both of them required an underlying tort that had not been established, and explicitly approving of the trial court's observation that "'[b]oth claims are not actionable torts, but rather require a separate tort before liability can attach[.]'" *Id*. at 131-132. In other words, this Court was not called upon to determine whether "concert of action" was a valid claim, but rather whether the trial court's reasoning had been sound. Construing the absence of an unnecessary pronouncement to be an outright holding to the contrary does not even rise to the level of relying on dicta.

Plaintiff additionally relies on our Supreme Court's decision in *Gerling Konzern v Lawson*, 472 Mich 44, 56; 693 NW2d 149 (2005). Plaintiff again correctly points out that our Supreme Court stated that "a 'common liability' exists in situations in which multiple tortfeasors are liable for the same injury to a person or property or for the same wrongful death," further stating that the "1995 tort reform legislation does not negate the existence of common liability among such multiple tortfeasors." *Id*. However, the case itself concerned the right of contribution for a tortfeasor who settled for more than the jury ultimately found that tortfeasor liable. The Court went on to observe that what tort reform *did* change is the possibility of a single tortfeasor being liable for the entirety of a common liability and then required to seek contribution from the other tortfeasors, whereas now "a tortfeasor need only pay a percentage of the common liability that is proportionate to his fault." *Id*. at 52-54, 56-57. The broader context of the Court's statement was the pronouncement that a settling tortfeasor had "a statutory right to seek contribution from other responsible tortfeasors after having settled with the injured parties in the underlying tort action, and tort reform legislation in 1995 does not alter this right." *Id*. at 62-63. It expressly held that such contribution claims may well be of reduced necessity, but remained permissible; otherwise, "the 1995 legislation eliminated joint and several liability in certain tort actions, requires that the fact-finder in such actions allocate fault among all responsible tortfeasors, and provides that each tortfeasor need not pay damages in an amount greater than his allocated percentage of fault." *Id*. at 51.

Plaintiff relies on an unpublished case that has no precedentially binding effect. MCR 7.215(C)(1). We think that the opinion itself engaged in a certain amount of somewhat ambiguous semantic hair-splitting, and plaintiff's interpretation thereof is at least not wholly unreasonable on its face. However, that opinion relied on a published case holding that "[t]he significance of [the tort reform] change is that each tortfeasor will pay only that portion of the total damage award that reflects the tortfeasor's percentage of fault" and "the trier of fact must consider the fault of each person who contributed to the tort, not only those who are parties to the litigation." *Smiley v Corrigan*, 248 Mich App 51, 55-56; 638 NW2d 151 (2001). The opinion certainly did not explicitly hold that "concert of action" remains a viable claim, and by inference we do not believe any such holding had been intended, even if the case were binding on us.

Plaintiff argues that "if the jury was presented with the Plaintiff-Appellant's concert of action theory it could have reasonably found each of these individuals negligent and a proximate cause of [Peterson's] death." The jury *did*, in fact, consider the fault of each of the defendants. Pursuant to MCL 600.2956, none of the defendants in this matter may be found liable for the entirety of an injury simply because of an undifferentiated contribution thereto, or be liable for

-8-

any portion thereof without a specifically allocated percentage of fault. Irrespective of whether any case to date has explicitly so held in so many words, we do so now: "concert of action" as a cause of action is incompatible with MCL 600.2956.

Plaintiff next argues that the trial court erroneously prohibited her from impeaching Smith with a prior conviction of attempted joyriding in violation of MCL 750.414, arguing that this Court has held unlawful use of a motor vehicle to constitute a crime involving dishonesty. Incredibly, plaintiff simply fails to address MRE 609(c), which states:

> Time Limit. Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date.

According to the criminal docket sheet plaintiff herself provided, Smith was convicted of attempted unlawful use of a motor vehicle, MCL 750.414, by a plea on March 31, 2003, and he was sentenced to nine days in jail. Ten years from the latest date would have elapsed by April 10, 2013. Although the tortious conduct in this matter occurred in 2012, this claim was not filed until December 13, 2013. Consequently, the trial court correctly found the joyriding conviction inadmissible irrespective of whether it contains an element of theft or dishonesty. We find plaintiff's argument devoid of even arguable legal merit and impossible to have been based on a reasonable inquiry. MCR 2.114(D)(2). However, because of the trivial ease with which it could be disposed and the fact that Smith is, as will be noted, a prevailing party and already entitled to costs, MCR 7.219(A), we impose no sanctions because any such sanctions would only be punitive. MCR 2.114(E).

Finally, plaintiff argues that the trial court erred in allowing Dr. Benjamin Mosher, an emergency room doctor who treated Peterson, to testify regarding the low likelihood, in his opinion, that Peterson's skull fractures could have been caused by a fall from standing height. We disagree.

Plaintiff stipulated to Dr. Mosher's qualifications despite being offered an opportunity for voir dire, and made a total of two objections during Dr. Mosher's testimony. Plaintiff objected to the relevance of how many out of Dr. Mosher's 9,000 or so patients had presented with a similar skull fracture, which the trial court apparently overruled or otherwise resolved off the record. Plaintiff also objected to Dr. Mosher's opinion that a fall from a greater distance would be more likely to cause an injury like the one Peterson suffered, on the grounds that "he's only seen six of this nature," which the trial court overruled. Giving plaintiff the very maximal benefit of the doubt, the latter objection *could* reasonably be construed as a challenge to Dr. Mosher's practical expertise to render an opinion about how far of a fall would be necessary to produce an injury similar to the skull fracture Peterson suffered. While minimal, appellate consideration is not precluded merely because a party makes a more developed or sophisticated argument on appeal. See *Steward v Panek*, 251 Mich App 546, 554; 652 NW2d 232 (2002). We prefer to resolve issues on their merits where possible, so we will construe plaintiff's objections in her favor to the extent we can.

However, plaintiff is limited to challenging Dr. Mosher's practical and particular expertise only. Plaintiff's stipulation to Dr. Mosher's formal or general expertise, and failure to contend in the trial court that Dr. Mosher exceeded his field of expertise, precludes plaintiff from making a challenge thereto at this time. *Chapdelaine v Sochocki*, 247 Mich App 167, 177; 635 NW2d 339 (2001). "[E]rror requiring reversal cannot be error to which the aggrieved party contributed by plan or negligence." *Farm Credit Services of Michigan's Heartland, PCA v Weldon*, 232 Mich App 662, 684 591 NW2d 438 (1998). Prior to admitting expert testimony, a trial court must properly and thoroughly exercise its "gatekeeping" function under MRE 702 to ensure that "each aspect" of the expert testimony is reliable. *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 779-781; 685 NW2d 391 (2004). However, the trial court is simply not obligated to do so *sua sponte*, but rather is only required to do so upon request, and failing to bring the issue to the court's attention waives it. See *Craig v Oakwood Hosp*, 471 Mich 67, 82; 684 NW2d 296 (2004). Plaintiff has, quite simply, waived the issue.

Nevertheless, pursuant to giving plaintiff the benefit of the doubt, plaintiff did make a specific objection to Dr. Mosher's opinion testimony regarding the likelihood of any particular fall causing Peterson's injuries. Plaintiff objected that it called for speculation and conjecture because Dr. Mosher had only seen six or so fractures of that nature. Michigan courts have a time-honored tradition of looking to the substance of arguments rather than nomenclature, which, of course, unambiguously furthers the cause of justice and fairness. See *Hurtford v Holmes*, 3 Mich 460, 463 (1855); *In re Traub Estate*, 354 Mich 263, 278-279; 92 NW2d 480 (1958); *Wilcox v Moore*, 354 Mich 499, 504; 93 NW2d 288 (1958); *Norris v Lincoln Park Police Officers*, 292 Mich App 574, 582; 808 NW2d 578 (2011). With that in mind, we construe plaintiff's objection as essentially being an objection to foundation. The trial court overruled the objection without any analysis or argument on the record. We think the issue may have warranted somewhat more thoughtful consideration, but we ultimately conclude that the decision was either correct or harmless.

Dr. Mosher was called as a witness by Smith. It was established initially that Dr. Mosher had seen "maybe half a dozen" comparable basilar skull fractures like the one Peterson presented with over the course of a career spanning some nine thousand patients. Dr. Mosher was asked, *with no objection*, to explain how such a fracture could occur, to which Dr. Mosher explained that it could happen from any number of mechanisms, like falling or being struck or being shot or being involved in a car accident. He further explained that he had never seen a diffused, 11-centimeter fracture like the one Peterson had. He further testified, again *with no objection*, that skull fractures caused by falls from standing height were typically more local in shape, which was inconsistent with the fracture Peterson had, particularly in combination with the coma level Peterson was in and the internal bleeding he had. Dr. Mosher was asked whether it would make a difference whether a person fell "from a standing height who is 6 foot 2 as opposed to 5 foot 2" (in context, meaning a taller person falling to the ground), to which Dr. Mosher replied that he would not expect one foot to make a meaningful difference. When asked about a ten-foot fall, he opined that such a fall made a fracture like the one Peterson had "more likely than falling from 6 foot 2."

Plaintiff objected when Smith's attorney asked Dr. Mosher, "What about another 20 feet?" After the objection was overruled, Dr. Mosher agreed that another twenty feet would indeed make such a fracture more likely. However, he then clarified that he was not saying that

Peterson's fracture necessarily required a fall from such a height, but rather only that a fall from twenty to thirty feet was more likely to cause such a fracture than a fall from six feet. He therefore concluded that it was "highly unlikely" that Peterson's injuries were caused by a fall from standing height and hitting his head on the ground, because he "just d[idn't] think that that mechanism would sustain the amount of force needed to fracture Mr. Peterson's skull the way it was and sustain the injury and having him be in a coma that he was," and a punch to the mouth was "unlikely" to have caused Peterson's death. Plaintiff declined to ask Dr. Mosher any questions at all.

Given Dr. Mosher's stipulated-to expertise and his experience with not only other injuries but such phenomena as comas and internal bleeding, we do not believe that it would have been an abuse of discretion for the trial court to overrule an objection to foundation, nor did Dr. Mosher engage in any inappropriate speculation or conjecture. Furthermore, the jury was made aware that Dr. Mosher had little to no other experience with a similar injury. At no point did Dr. Mosher opine that it was impossible for Peterson to have sustained the injury from a mere fall. Plaintiff could have followed up on that lack of experience and highlighted it, but elected not to. The mere fact that testimony is not advantageous, in this case because it presumably increased the likelihood that the jury would believe only Suttle, who had a baton, could have inflicted a fatal blow, does not make it improper. Even if the trial court's decision had been erroneous, we are not persuaded that it would have been sufficiently prejudicial to warrant our intervention. MCR 2.613(A).

The trial court is affirmed. Brannigan, Smith, and McClain, being the prevailing parties who actually participated in this appeal, may each tax costs. MCR 7.219(A).

/s/ Amy Ronayne Krause
/s/ Karen M. Fort Hood
/s/ Colleen A. O'Brien

-11-