*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

JILL CREECH BAUER, JILL CREECH BAUER
LEGAL SERVICES, PLLC, and ATTORNEYS
FOR INDIGENT MOTHERS, PLLC,

Plaintiffs-Appellants,

v

JESSICA HAMMON, ERICA EDGINGTON,
NICHOLAS D'AIGLE, LAW OFFICES OF
JESSICA J. HAMMON, PLLC, ATTORNEYS
FOR INDIGENT DEFENSE, PLLC, MARCIA L.
STIPES, LAW OFFICES OF J. J. EDWARDS,
PLLC, and JADE EDWARDS,

Defendants-Appellees.

UNPUBLISHED
February 12, 2019

No. 339703
Genesee Circuit Court
LC No. 15-105396-CZ

Before: O'BRIEN, P.J., and TUKEL and LETICA, JJ.

PER CURIAM.

Plaintiffs, Jill Creech Bauer, Jill Creech Bauer Legal Services, PLLC, and Attorneys for Indigent Mothers, PLLC (AIM), appeal as of right the trial court's order granting summary disposition to defendants Jessica Hammon, Erica Edgington, Nicholas D'Aigle, Law Offices of Jessica J. Hammon, PLLC, and Attorneys for Indigent Defense, PLLC. Plaintiffs also challenge the trial court's earlier order granting summary disposition to defendants Marcia L. Stipes, Jade Edwards, and the Law Offices of J. J. Edwards, PLLC. We affirm.

## I. BACKGROUND

Plaintiffs, being comprised of Bauer and the law firms she established and in which she has a 100% ownership interest, entered into a contractual relationship with Genesee County in November of 2011, under which members of AIM would provide legal representation to indigent

mothers involved in child protective proceedings (hereinafter the "AIM Contract"). The initial term of the AIM Contract ran from November 1, 2011, to October 31, 2012, with an option to extend the agreement for up to two additional one-year terms. The individual defendants[1] were engaged and paid by plaintiffs to provide services and legal representation required under AIM's contractual obligation, although their respective business relationships were not memorialized in writing. Disputes arose regarding payment for the legal services being provided under the AIM Contract. In 2014, after defendant Edgington opened mail containing plaintiffs' bank statement, it was asserted and communicated among defendants that Bauer had improperly withdrawn $11,000 in contractual monies for personal benefit, potentially precluding the distribution of these monies among defendants.[2] At some point in late 2014 or early 2015, defendants Hammon, D'Aigle, Edwards, and Stipes formed their own entity, Attorneys for Indigent Defense, PLLC, to competitively bid against plaintiffs for the 2015 renewal of the contract for representation to indigent mothers in child protective proceedings (the 2015 Contract). Plaintiffs lost the bidding for the 2015 Contract to defendants.

Plaintiffs initiated this action in August 2015, alleging a number of improprieties by defendants, largely centered around their efforts to procure the 2015 Contract. Plaintiffs also alleged that certain defendants falsely told other individuals in the legal community and local courts that Bauer either embezzled or stole money from the AIM Contract funds. In their second amended complaint, plaintiffs asserted seven counts: (1) common law defamation; (2) statutory defamation; (3) a claim for exemplary and punitive damages; (4) civil conspiracy to defame; (5) intentional interference with contractual relations between plaintiffs and Genesee County; (6) intentional interference with a business expectancy; and (7) concert of action. In two separate orders, the trial court granted summary disposition in favor of defendants as to each count. This appeal followed.

## II. SUMMARY DISPOSITION – TORT CLAIMS

Plaintiffs contend the trial court erred in dismissing their claims based on the existence of genuine issues of material fact. Defendants filed motions for summary disposition pursuant to MCR 2.116(C)(8) and (10), with the trial court granting summary disposition in accordance with MCR 2.116(C)(10). As discussed in *Bernardoni v Saginaw*, 499 Mich 470, 472-473; 886 NW2d 109 (2016):

> We review de novo a trial court's decision regarding a motion for summary disposition to determine if the moving party is entitled to judgment as a matter of law. A motion for summary disposition made under MCR 2.116(C)(10) tests the factual sufficiency of the complaint. The Court considers all affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties in

---

[1] Defendants Hammon, D'Aigle, Edwards, and Stipes are attorneys who provided legal services required by the Contract. Defendant Edgington provided administrative assistance to AIM.

[2] We note that the allegation concerning the $11,000 withdrawal does not appear to have been substantiated below.

the light most favorable to the party opposing the motion. MCR 2.116(G)(4) states:

> A motion under subrule (C)(10) must specifically identify the issues as to which the moving party believes there is no genuine issue as to any material fact. When a motion under subrule (C)(10) is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his or her pleading, but must, by affidavits or as otherwise provided in this rule, set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, judgment, if appropriate, shall be entered against him or her.

This rule requires the adverse party to set forth specific facts at the time of the motion showing a genuine issue for trial. A reviewing court should consider the substantively admissible evidence actually proffered by the opposing party. When the proffered evidence fails to establish a genuine issue regarding any material fact, the moving party is entitled to judgment as a matter of law. [Citations omitted.]

## A. DEFAMATION

Plaintiffs raised claims of common law and statutory defamation against defendants Hammon and D'Aigle, asserting that they had published false statements to third parties implying Bauer's criminal act of theft or embezzlement. Defamation consists of four basic elements:

> (1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication. [*Ghanam v Does*, 303 Mich App 522, 544; 845 NW2d 128 (2014) (quotation marks and citation omitted).]

"A communication is defamatory if, considering all the circumstances, it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Hope-Jackson v Washington*, 311 Mich App 602, 620; 877 NW2d 736 (2015) (quotation marks and citation omitted). "Under MCL 600.2911(1), statements imputing a lack of chastity or the commission of a crime constitute defamation per se and are actionable even in the absence of an ability to prove actual or special damages." *Id.* at 620-621. Further, MCL 600.2911(7), states: "An action for libel or slander shall not be brought based upon a communication involving a private individual unless the defamatory falsehood concerns the private individual and was published negligently. Recovery under this provision shall be limited to economic damages including attorney fees."

In support of their defamation claims, plaintiffs refer to four general categories of false statements. First, plaintiffs maintain that, in communications between defendants, Hammon

regularly described Bauer's financial activities as dishonest and falsely accused her of stealing. Plaintiffs produced several emails in which defendants communicated about perceived improprieties in Bauer's handling of AIM funds. This category of statements was not directly addressed by the trial court, but defendants characterize these statements as internal discussions that do not satisfy the requirement for third-party publication. Plaintiffs contend that the "internal" nature of the discussions is irrelevant because the statements were published to persons other than Bauer, i.e., the other AIM members. We disagree.

Recognizing that defendants have not specifically claimed a privilege, "[t]he determination whether a privilege exists is one of law for the court." *Prysak v RL Polk Co*, 193 Mich App 1, 14-15; 483 NW2d 629 (1992). A qualified privilege exists for bona fide communications concerning "any subject-matter in which the party communicating has an interest, or in reference to which he has a duty to a person having a corresponding interest or duty." *Timmis v Bennett*, 352 Mich 355, 366; 89 NW2d 748 (1958) (quotation marks and citation omitted). The privilege for such communications encompasses circumstances in which the underlying duty is of a moral or social character. *Id.* In particular, "[t]he elements of a qualified privilege are (1) good faith, (2) an interest to be upheld, (3) a statement limited in its scope to this purpose, (4) a proper occasion, and (5) publication in a proper manner and to proper parties only." *Prysak*, 193 Mich App at 15. "A plaintiff may overcome a qualified privilege only by showing that the statement was made with actual malice, i.e., with knowledge of its falsity or reckless disregard of the truth." *Id.* "General allegations of malice are insufficient to establish a genuine issue of material fact." *Id.* This privilege is clearly applicable to the communications between defendants, as Hammon and the other AIM members had an obvious interest in the proper disposition of the funds that were provided by the county for payment of their services. Accordingly, plaintiffs did not offer evidence of an unprivileged communication to a third party with respect to this category of statements. See *Ghanam*, 303 Mich App at 544.

The second category of statements underlying plaintiffs' defamation claims concern Hammon's conversations with Judge Michael Theile. Plaintiffs contend that Hammon told Judge Theile that Bauer embezzled money, offering emails Hammon sent to other defendants as evidence that these statements were made. In one email, Hammon said, "I was talking with Judge Theile about it and though he promised me he would [sic] talk about it to anyone he said that we may soon be in a position where we HAVE to grieve her." In a later email, Hammon wrote: "I plan to meet with Judge Theile about how he thinks we should proceed if and when she doesn't answer [a demand for accounting]. He already knows what is going on and will probably have some insight into how to approach the judges if we need to." Notably, neither email indicates with any specificity what Hammon may have discussed with Judge Theile. Judge Theile recalled having a conversation with Hammon about obtaining an accounting and the details of the AIM Contract, during which he suggested that Hammon speak with court administrator Barbara Menear for that purpose. He testified that his conversations with Hammon concerned ensuring the proper disclosure and distribution of funds from a government contract, and he unequivocally indicated that there were no allegations or suggestions of embezzlement or theft. Based upon this evidence, the trial court did not err by finding that plaintiffs failed to produce evidence of false and defamatory statements arising from Hammon's conversations with Judge Theile. Instead, the evidence merely indicates that Hammon may have expressed concern about Bauer's handling of the AIM Contract, but did not assert that Bauer embezzled money or engaged in other misconduct as a matter of fact.

-4-

Next, plaintiffs point to conversations between Menear, Hammon, and D'Aigle regarding opening the 2015 Contract for rebidding. Menear did not recall Hammon or D'Aigle disparaging Bauer, but had the impression that there was dissension within the group. When questioned whether she had heard any "comments about financial improprieties" involving AIM or Bauer, Menear responded:

> I do remember something about the appeals, but I don't know the machinations within AIM as to who was doing the appeals. That's with Ms. Bauer, how her team delivered the scope of work. I remember Ms. Hammon saying something about she thought there were less appeals than maybe Ms. Bauer was saying there were. What that translates into with respect to workload or money, I have no idea.

Menear clarified that Hammon did not indicate that Bauer had misappropriated or taken funds from the AIM Contract and that the dispute seemed to arise from allocation of appellate work. Again, this evidence does not demonstrate publication of false or defamatory statements of criminal misconduct, but rather discussions from which Menear inferred that Hammon and D'Aigle may have been dissatisfied with their working relationship with Bauer.

The last category of statements underlying plaintiffs' defamation claims involve a statement purportedly made by D'Aigle's wife to paralegal Debra Mudge. The trial court rejected plaintiffs' reliance on Mudge's testimony, in which Mudge indicated that "she [Mrs. D'Aigle] said we saw some bank statements of Attorney Bauer's and believe she is stealing money from the fund, the indigent mothers fund." The trial court reasoned that Mudge's testimony amounted to inadmissible hearsay.[3] We disagree with the trial court's conclusion in this regard, as evidence of an out-of-court statement offered to prove that the statement was made, rather than as substantive evidence of the truth of the matter asserted, is not hearsay. See *Hilliard v Schmidt*, 231 Mich App 316, 318; 586 NW2d 263 (1998), overruled in part on other grounds by *Molloy v Molloy*, 247 Mich App 348; 637 NW2d 803 (2001), aff'd in part, vacated in part 466 Mich 852 (2002). Nonetheless, the trial court reached the right result. Mrs. D'Aigle was not a party to the case, and there was no evidence presented from which we will attribute to defendants statements published by Mrs. D'Aigle.

In sum, because plaintiffs failed to present evidence demonstrating the existence of a genuine issue of material fact as to whether defendants made unprivileged defamatory statements concerning plaintiffs to third parties, the trial court did not err by granting summary disposition with respect to plaintiffs' defamation claims.[4]

---

[3] The trial court also noted that the hearsay statement may be inadmissible on the basis of marital privilege, but ultimately premised its ruling on its belief that the statement was inadmissible as hearsay.

[4] Likewise, the trial court did not err by granting summary disposition with respect to Count III of plaintiffs' second amended complaint, under which plaintiffs sought exemplary and punitive damages arising from defendants' failure to retract their defamatory statements. See MCL

## B. CIVIL CONSPIRACY

Plaintiffs also alleged a civil conspiracy between Hammon and Edgington to defame plaintiffs. "A civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means." *Admiral Ins Co v Columbia Cas Ins Co*, 194 Mich App 300, 313; 486 NW2d 351 (1992). The failure "to state any tortious action" is fatal to the ability to sustain a conspiracy claim. *Id*. See also *Advocacy Org for Patients & Providers v Auto Club Ins Ass'n*, 257 Mich App 365, 384; 670 NW2d 569 (2003), aff'd 472 Mich 91 (2005) ("[A] claim for civil conspiracy may not exist in the air; rather, it is necessary to prove a separate, actionable tort.") (quotation marks and citation omitted). Because plaintiffs have failed to establish the underlying tort of defamation, the claim of civil conspiracy was properly dismissed by the trial court.

## C. INTENTIONAL INTERFERENCE WITH A CONTRACT AND WITH BUSINESS RELATIONS OR EXPECTANCY

Plaintiffs contend that their failure to be awarded the 2015 Contract and the opening of rebidding was attributable to the wrongful conduct of defendants and their interference with plaintiffs' business relations and expectancies. "The elements of tortious interference with a contract are (1) the existence of a contract, (2) a breach of the contract, and (3) an unjustified instigation of the breach by the defendant." *Health Call of Detroit v Atrium Home & Health Care Servs, Inc*, 268 Mich App 83, 89-90; 706 NW2d 843 (2005). A claim of intentional interference with business relations is a similar, though distinct, cause of action, requiring proof of

> (1) the existence of a valid business relationship or expectancy that is not necessarily predicated on an enforceable contract, (2) knowledge of the relationship or expectancy on the part of the defendant interferer, (3) an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and (4) resulting damage to the party whose relationship or expectancy was disrupted. [*Id*. at 90.]

To establish intentional interference with a business relationship or expectancy, the plaintiff must show "the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another." *Badiee v Brighton Area Sch*, 265 Mich App 343, 367; 695 NW2d 521 (2005) (quotation marks and citation omitted). Further, to establish "a valid business expectancy," plaintiff is required to demonstrate that "[t]he expectancy must be a reasonable likelihood or probability not mere wishful thinking." *Cedroni Assoc, Inc v Tomblinson, Harburn Assoc, Architects & Planners Inc*, 492 Mich 40, 45; 821 NW2d 1 (2012) (quotation marks and citation omitted; alteration in original).

---

600.2911(2)(b). Recovery of *any* damages necessarily requires plaintiffs to successfully establish the underlying claim. Because plaintiffs failed to establish their defamation claim, we need not address the availability of exemplary or punitive damages any further.

Initially, plaintiffs have been unable to establish any wrongdoing by defendants, having failed to support their claims of defamation. In addition, plaintiffs cannot support their claim regarding interference with the AIM Contract because it was completed without breach by either party. Plaintiffs were not accused by Genesee County of failing to perform their contractual obligations or performing those duties improperly, nor was the AIM Contract terminated prematurely. There is likewise no assertion that defendants, despite their dissatisfaction with plaintiffs, stopped or did not fulfill their legal obligations in accordance with their agreement and history of practice with plaintiffs.

With regard to the bidding process for the 2015 Contract renewal and defendants' efforts to obtain it, plaintiffs are unable to establish a wrongful interference with their business relations or expectancies. First, plaintiffs have not established wrongdoing, by the asserted acts of defamation, as a required element for the tort of interference with a business relationship or expectancy. See *Lakeshore Community Hosp, Inc v Perry*, 212 Mich App 396, 402-403; 538 NW2d 24 (1995) (finding that the defendant did not defame or interfere with business relations by, among other actions, "questioning the operation of the plaintiff hospital" and expressing opposition to merger). Second, plaintiffs did not have a valid expectation that the AIM Contract would be renewed indefinitely. In pertinent part, the original AIM Contract, initiated November 1, 2011, stated:

1.     Term

     1.1     Initial Term

          The initial term of this Agreement commences on November 1, 2011 and shall be effective through October 31, 2012 (the "Initial Term").

     1.2     Extension Terms

          The Board has the option to extend this Agreement for up to two (2) additional one year terms (the "Extension Terms").

The AIM Contract was extended an additional year from October 21, 2012, through September 30, 2013, comprising "the first year extension of the previously existing contract." The AIM Contract was again extended to cover October 1, 2013, through September 30, 2014, representing "the second, 1 year extension of the original contract." Plaintiffs' services were actually extended slightly beyond the expiration time period to permit the county to open and process bids on the new 2015 Contract. Menear confirmed that the original AIM Contract and extensions had run their course such that it was time to initiate requests for proposals. As a result of the request for proposals, "at least two" proposals were received, and a decision was made by the Family Division judges regarding the recipient to be awarded the 2015 Contract. Plaintiffs have failed to establish evidence from which a factfinder could conclude that the award of the 2015 Contract to defendants rather than plaintiffs was the result of any improper conduct and not simply a legitimate business decision based on the bids received.

Plaintiffs contend that defendants were her agents and, therefore, precluded from competing with her for the 2015 Contract. Defendants, on the other hand, contend that their

-7-

relationship with plaintiffs was that of independent contractors rather than agents. For purposes of liability in this case, the distinction is functionally irrelevant. Plaintiffs and defendants did not have contracts with enforceable restrictions on defendants' ability to compete with plaintiffs for the 2015 Contract with Genesee County. Even if defendants are construed to be the agents of plaintiffs, they did not interfere with the existing AIM Contract, which terminated when it expired, and there is no complaint that defendants failed to fulfill their obligations to plaintiffs with regard to the provision of assigned legal services under the AIM Contract. Defendants, even if deemed to be plaintiffs' agents, were not precluded from competing with plaintiffs for the 2015 Contract.[5] Competition does not equate to interference, particularly when plaintiffs have not established either a right or an expectancy that the AIM Contract would be renewed.

## D. CONCERT OF ACTION

Plaintiffs also allege the applicability of a concert of action theory. Historically, such a theory permitted a plaintiff to hold a defendant liable for the tortious conduct of others, if that defendant acted in concert with the others to cause the plaintiff injury. See *Abel v Eli Lilly & Co*, 418 Mich 311, 337-338; 343 NW2d 164 (1984). However, this Court has recently determined that " 'concert of action' is . . . no longer a viable cause of action in Michigan." *Mueller v*

---

[5] According to the Restatement Agency, 2d, § 393, Comment (e), p 218:

> *Preparation for competition after termination of agency.* After the termination of his agency, in the absence of a restrictive agreement, the agent can properly compete with his principal as to matters for which he has been employed. See § 396. Even before the termination of the agency, he is entitled to make arrangements to compete, except that he cannot properly use confidential information peculiar to his employer's business and acquired therein. Thus, before the end of his employment, he can properly purchase a rival business and upon termination of employment immediately compete. He is not, however, entitled to solicit customers for such rival business before the end of his employment nor can he properly do other similar acts in direct competition with the employer's business.

> The limits of proper conduct with reference to securing the services of fellow employees are not well marked. An employee is subject to liability if, before or after leaving the employment, he causes fellow employees to break their contracts with the employer. On the other hand, it is normally permissible for employees of a firm, or for some of its partners, to agree among themselves, while still employed, that they will engage in competition with the firm at the end of the period specified in their employment contracts. However, a court may find that it is a breach of duty for a number of the key officers or employees to agree to leave their employment simultaneously and without giving the employer an opportunity to hire and train replacements.

*Brannigan Brothers Restaurants and Taverns, LLC*, 323 Mich App 566, 580; 918 NW2d 545 (2018). As such, dismissal of plaintiffs' claim by the trial court under this theory was not in error.

## III. DISCOVERY – DOCUMENT PRODUCTION

Plaintiffs also contend that the trial court erred in failing to compel the disclosure of documents generated during routine judges' meetings involving discussions regarding the AIM Contract and the rebidding of the 2015 Contract.

"This Court reviews a trial court's decision to grant or deny discovery for an abuse of discretion." *King v Mich State Police Dep't*, 303 Mich App 162, 175; 841 NW2d 914 (2013) (quotation marks and citation omitted). An abuse of discretion is found to have occurred when the trial court's decision falls outside the range of principled outcomes. *Maldonado v Ford Motor Co*, 476 Mich 372, 388; 719 NW2d 809 (2006).

During her deposition, Menear testified that she had minutes from judges' meetings at which the decision on whether to reopen the AIM Contract for rebidding was addressed, as well as the decision to award the new 2015 Contract to defendants. After Menear refused to produce the minutes, believing they were confidential, plaintiffs filed a motion to compel production of the documents, as well as Menear's testimony regarding what occurred at the judges' meetings. While recognizing that the Freedom of Information Act (FOIA), MCL 15.231 *et seq.*, was not controlling in this matter, the trial court considered it "helpful" in light of plaintiffs' failure to identify any law that supported their requested discovery. The trial court reasoned that the courts of this state are not public bodies for purposes of the FOIA[6] and, therefore, a court's administrative records are not public records. Accordingly, the trial court denied plaintiffs' motion to compel, but qualified its ruling by permitting plaintiffs to question the judges who participated in the meetings about the events that occurred.

Thereafter, plaintiffs deposed only Judge Theile and, otherwise, failed to pursue the matter. Given plaintiffs' failures, they are not entitled to relief. See, e.g., *Munson Med Ctr v Auto Club Ins Ass'n*, 218 Mich App 375, 388; 554 NW2d 49 (1996) (rejecting claim that the trial court improperly granted summary disposition without permitting certain discovery when the defendant had failed to move to compel the testimony and did not raise the issue until after summary disposition was granted).

But even if we reached the merits of plaintiffs' claim, the trial court reached the correct result, albeit for the wrong reason. *Southfield Ed Ass'n v Bd of Ed of Southfield Pub Schools*, 320 Mich App 353, 374; 909 NW2d 14 (2017) (" '[A] trial court's ruling may be upheld on appeal where the right result issued, albeit for the wrong reason.' "), quoting *Gleason v Dep't of*

---

[6] In relevant part, the definition of the term "public body" for purposes of the FOIA provides that "the judiciary, including the office of the county clerk and its employees when acting in the capacity of clerk to the circuit court, is not included in the definition of public body." MCL 15.232(h)(*iv*).

*Transp*, 256 Mich App 1, 3; 662 NW2d 822 (2003). Below, the parties and court acknowledged that plaintiffs did not seek production of the meeting minutes by way of a FOIA request. Therefore, the trial court erred by relying upon FOIA considerations in lieu of considering this issue under the framework applicable to general discovery in civil actions. "Michigan has a broad discovery policy that permits the discovery of any matter that is not privileged and that is relevant to the pending case." *Arabo v Mich Gaming Control Bd*, 310 Mich App 370, 398; 872 NW2d 223 (2015) (quotation marks and citation omitted). MCR 2.302(B)(1) provides, in relevant part:

> *In General.* Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of another party, including the existence, description, nature, custody, condition, and location of books, documents, or other tangible things, or electronically stored information and the identity and location of persons having knowledge of a discoverable matter. It is not ground for objection that the information sought will be inadmissible at trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

Among the privileges that may limit the otherwise broad scope of discovery is the deliberative-process privilege recognized by this Court in *Ostoin v Waterford Twp Police Dept*, 189 Mich App 334, 337-338; 471 NW2d 666 (1991). The privilege applies to interagency documents involving part of a "deliberative or evaluative process." *Id*. at 338. The deliberative-process privilege

> allows the government to withhold documents and other materials that would reveal "advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." Although this privilege is most commonly encountered in Freedom of Information Act . . . litigation, it originated as a common law privilege. Two requirements are essential to the deliberative process privilege: the material must be predecisional and it must be deliberative. Both requirements stem from the privilege's "ultimate purpose[, which] . . . is to prevent injury to the quality of agency decisions" by allowing government officials freedom to debate alternative approaches in private. The deliberative process privilege does not shield documents that simply state or explain a decision the government has already made or protect material that is purely factual, unless the material is so inextricably intertwined with the deliberative sections of documents that its disclosure would inevitably reveal the government's deliberations. [*Trudel v Dearborn*, 291 Mich App 125, 135-136; 804 NW2d 744 (2010) (citation omitted; alteration in original).]

The information from the minutes of the judges' meetings clearly falls within the scope of the deliberative-process privilege. Plaintiffs sought the meeting minutes in order to discern how the judges came to a decision as to whether to open the AIM Contract for bidding in 2015 and how they determined that the new 2015 Contract should be awarded to defendants. Thus, the information sought by plaintiffs was both predecisional and deliberative. Consequently, it

was exempt from discovery under the deliberative-process privilege, and the trial court did not abuse its discretion by denying plaintiffs' motion to compel.

Affirmed.

/s/ Colleen A. O'Brien
/s/ Jonathan Tukel
/s/ Anica Letica