*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

---

NOEL DORSEY,

        Plaintiff-Appellee,

v

SURGICAL INSTITUTE OF MICHIGAN, LLC,
and SURGICAL INSTITUTE OF MICHIGAN
AMBULATORY SURGERY CENTER, LLC,

        Defendant-Appellants,

and

ARIA OMAR SABIT, MICHIGAN BRAIN &
SPINE PHYSICIANS GROUP, PLLC, JIAB
HASAN SULEIMAN, and JIAB SULEIMAN, D.O.,
PC, doing business as PREMIER ORTHOPEDICS,

        Defendants.

FOR PUBLICATION
July 29, 2021
9:05 a.m.

No. 349759
Wayne Circuit Court
LC No. 16-015658-NH

---

Before: BOONSTRA, P.J., and CAVANAGH and GADOLA, JJ.

PER CURIAM.

Defendants, Surgical Institute of Michigan, LLC, and Surgical Institute of Michigan Ambulatory Surgery Center, LLC (collectively, SIM[1]), appeal as of right a judgment entered in plaintiff's favor following a jury trial in this medical malpractice action. We reverse and remand for entry of judgment in favor of SIM.

## I. BACKGROUND FACTS

---

[1] Surgical Institute of Michigan, LLC, and Surgical Institute of Michigan Ambulatory Surgery Center, LLC, were treated as a single entity throughout these proceedings.

This matter arises from a surgery codefendant Dr. Aria Omar Sabit performed on plaintiff, Noel Dorsey, at SIM on February 8, 2012. Dr. Sabit's operative report indicates that he performed a posterior lumbar interbody fusion, a laminectomy for decompression of the nerve, and an interbody cage placement, all at the L4-L5 level of plaintiff's spine. Plaintiff's back pain persisted after the procedure. Plaintiff filed this lawsuit in 2016 after learning from another neurosurgeon that the described procedures were not actually performed. Plaintiff asserted a medical malpractice claim and other theories against Dr. Sabit and his practice, Michigan Brain and Spine Physicians Group, PLLC (MBSPG). Neither Dr. Sabit nor MBSPG filed timely answers, and defaults were entered against both defendants on March 17, 2017—which are not at issue in this appeal.[2]

Plaintiff's complaint also raised numerous claims against SIM, an ambulatory surgery center which claimed to have "the most highly trained and experienced medical professionals." Only plaintiff's medical malpractice claim against SIM, premised on a negligent credentialing theory, is at issue in this appeal.

During discovery, plaintiff filed a motion to compel asserting that SIM failed to produce certain requested documents, including Dr. Sabit's application for privileges, credentialing reviews conducted by SIM with respect to Dr. Sabit, and other documents demonstrating that Dr. Sabit was appropriately trained and licensed. SIM responded that the credentialing file was privileged and protected from disclosure under MCL 333.21515. Plaintiff replied that MCL 333.21515 afforded protection to hospitals only. And because SIM was a freestanding surgical outpatient facility licensed under a different section of the Public Health Code, MCL 333.1101 *et seq.*, it could not rely on the confidentiality provision in MCL 333.21515. SIM responded that it was a health facility, as set forth in MCL 333.20175(8), and entitled to the protections afforded by statute. SIM also cited MCL 333.21515 and MCL 333.20175 in its written objections to plaintiff's request for production relating to personnel files, as well as a motion for protective order. The trial court determined that the Legislature intended to treat hospitals and freestanding surgical outpatient facilities differently and that only hospitals were given statutory protections against disclosing peer review files. Although SIM produced its credentialing file regarding Dr. Sabit pursuant to the court's order, SIM continued to object to the admissibility of the file.[3]

---

[2] Plaintiff's complaint also raised claims against Dr. Jiab Hasan Suleiman and his practice, Jiab Suleiman, D.O., PC, doing business as Premier Orthopedics. Dr. Suleiman was identified as the co-surgeon in the operative report, but he testified at trial that he was only present during the initial dissection of the surgical site and then left to attend his own patients. The jury found that Dr. Suleiman was not professionally negligent, and a no-cause judgment was entered in favor of Dr. Suleiman and his practice—which is not at issue in this appeal.

[3] Although we conclude that the credentialing file was privileged and should not have been the subject of discovery or admitted into evidence at trial, the fact remains that, in this case, the file was produced under the trial court's order and at least parts of it were made part of the lower court record and were addressed and disclosed in the briefs on appeal. This Court also previously denied a motion to seal the credentialing file. See *Dorsey v Surgical Institute of Michigan LLC*,

The credentialing file included a series of letters that formed the primary evidentiary basis for plaintiff's case against SIM. Dr. Sabit submitted an application for surgical privileges at SIM on or about April 29, 2011. In the application, Dr. Sabit indicated that he had privileges at Community Memorial Hospital (CMH) in Ventura, California, from 2009 to 2011 and had current privileges at Doctor's Hospital in Pontiac, Michigan. As part of their credentialing process, SIM sent a letter to CMH requesting verification of Dr. Sabit's status there and a summary of any disciplinary actions within the previous five years. CMH responded with a request for Dr. Sabit to sign a comprehensive release permitting disclosure of information. On May 19, 2011, after the release was signed and returned, Dr. Marc Beaghler, CMH's chief of staff, provided the following response:

> In response to your request regarding [Dr. Sabit], the following information is provided:

| | |
|---|---|
| Current Status: | Resigned (Provisional at the time of Resignation) |
| Appointment Date: | 8/11/2009 to 1/13/2011 |
| Primary Specialty: | Neurosurgery |
| Department: | Surgery |

> A review of information available indicates that this practitioner has <u>not always complied with the Medical Staff Bylaws, Rules and Regulations</u>, and other policies of Community Memorial Hospital of San Buenaventura. Action had <u>been taken against this practitioner's clinical privileges in the form of a brief summary suspension</u>. At the time he resigned from the Medical Staff his practice was the <u>subject of a focused review but was not the subject of any formal investigation or disciplinary action</u>. Please note that this letter does not address administrative suspension for expired licenses, liability certificates or health testing requirements. To our knowledge, there are no disciplinary actions pending against this individual, nor any health condition that might compromise this practitioner's ability to provide services to your organization or facility.

> As required by The Joint Commission, each member of our staff with clinical privileges is subject to ongoing and focused professional practice evaluation. Included in this evaluation is assessment of patient care practices, clinical knowledge and judgment, continuing medical education, improvement in the use of evidence-based medicine and technology, interpersonal and communication skills, professionalism, and practice of, and advocacy for, patient safety concepts. Ongoing professional practice evaluation of this practitioner's practice <u>revealed several concerns</u>.

---

unpublished order of the Court of Appeals, entered May 6, 2020 (Docket No. 349759). Under the circumstances, we will therefore discuss aspects of the credentialing file in this opinion.

SIM's credentialing file contained two copies of this letter. The first, presumably original, copy did not have the underlining reflected in the above quotation. The second copy included the above underlining added by hand.

On May 20, 2011, SIM sent a letter to Dr. Sabit indicating that CMH had raised issues that required further investigation before privileges could be granted. The letter continued, "Specifically, the chief of staff has informed us that you were non-compliant with policies, medical staff bylaws, rules and regulations." SIM therefore asked Dr. Sabit to respond in writing to address that issue. Dr. Sabit was further advised that SIM might request his personal appearance before the medical executive committee to discuss the matter if his written response was deemed insufficient. Although SIM's credentialing file did not contain a written response from Dr. Sabit, the next letter from SIM to Dr. Sabit, dated May 26, 2011, said:

> I want to thank you for your prompt response to the letter from SIM in regard to the peer review from Community Memorial Hospital. Your reply has been reviewed by the members of the medical executive committee. At this time you have been granted temporary privileges for the surgical procedures that you have requested, pending final approval of your credential packet from the board of directors.

Citing SIM's request for a written response from Dr. Sabit, its subsequent acknowledgment of Dr. Sabit's prompt response, and deposition testimony from SIM's medical director indicating that the written response would have been kept in the credentialing file, plaintiff asked the trial court to give an adverse inference instruction at trial, see M Civ JI 6.01, and sanction SIM for intentional spoliation of evidence. SIM opposed plaintiff's motions, denying that it removed or destroyed anything from the credentialing file before producing it to plaintiff. SIM argued that there was no evidence that Dr. Sabit submitted a written response, and SIM's medical director testified that he had no recollection of having seen any such response. The trial court agreed to give an adverse inference instruction because the evidence showed that SIM asked Dr. Sabit for a written response, acknowledged receipt of a response, and no response was produced with SIM's records. However, the court found no evidence that SIM intentionally destroyed evidence and therefore denied the motion for sanctions.

Plaintiff also filed a motion to determine the scope of SIM's liability for negligently credentialing Dr. Sabit, arguing that the damages cap applicable to medical malpractice verdicts should not be applied if SIM was found to be vicariously liable for Dr. Sabit's ordinary negligence ("in performing unnecessary, fictitious, and/or incorrect surgery of plaintiff's lumbar spine"), which had been established by default. SIM disagreed that Dr. Sabit's default could be imputed to it. SIM also argued that it could not be held jointly and severally liable for Dr. Sabit's actions under MCL 600.6304(6) because the respective liabilities arose from acts and omissions that differed in time, place, and type. The trial court ruled that SIM could be held jointly and severally liable if plaintiff obtained a verdict against Dr. Sabit, but only with respect to a malpractice claim. The court also determined that plaintiff was required to prove that Dr. Sabit committed malpractice as part of her negligent credentialing claim against SIM, plaintiff could not rely on Dr. Sabit's default for that purpose, and SIM was free to dispute Dr. Sabit's malpractice as part of its defense.

Of the nearly 20 motions in limine filed by the parties, only two have particular relevance to the issues on appeal. In the first, SIM moved for separate trials with respect to the negligent credentialing claim against it and the medical malpractice claims against Drs. Sabit and Suleiman. SIM argued that separate trials would prevent SIM from unnecessarily having to participate in a lengthy medical malpractice trial, there was little overlap between the proofs for each respective claim, and that SIM would be unfairly prejudiced if plaintiff was "permitted to smear and taint the jury's consideration of SIM's credentialing decisions with the post-credentialing misdeeds of Dr. Sabit." The trial court denied the motion, reasoning that it would not promote judicial economy because the medical malpractice of Drs. Sabit and Suleiman was a necessary element of the negligent credentialing claim. The court also indicated that the claims against Drs. Sabit and Suleiman would be tried first and, after a verdict was received, the negligent credentialing claim would be tried before the same jury. When SIM attempted to renew its argument about the prejudice arising from defending the negligent credentialing claim after the jury finds Dr. Sabit professionally negligent, the trial court said, "And the answer to 'am I going to hold two separate trials with two separate Juries' is a resounding no I am not." (Internal quotation marks supplied).

SIM's second motion in limine asked the court to strike plaintiff's expert in credentialing and physician privileges, Dr. John Charles Hyde, II. SIM explained that plaintiff had previously represented that Dr. Beaghler (the chief of staff at CMH) would be deposed, but Dr. Beaghler had since expressed his intent to invoke a statutory privilege against testifying or providing other evidence regarding the peer review process at CMH and the events referenced in his letter about Dr. Sabit. Other evidence that would support the credentialing expert's opinion included National Practitioner Data Bank reports and California court records, but these sources should be deemed inadmissible because they were not available until after SIM granted Dr. Sabit privileges. Thus, SIM argued, the court should strike plaintiff's credentialing expert because his opinions would be speculative and would not have a basis in record evidence. The trial court denied SIM's motion, but declared that only evidence that was or should have been available at the time of SIM's credentialing decision could be admitted at trial.

The eight-day jury trial began on October 9, 2018, with the first five days devoted exclusively to the medical malpractice claims against Drs. Sabit and Suleiman. Plaintiff testified that Dr. Suleiman referred her to Dr. Sabit on January 11, 2012, for severe back pain. Dr. Sabit told her that she needed surgery, specifically, a lumbar fusion and laminectomy. He also talked about hardware that would be placed during the surgery. Dr. Sabit performed the surgery at SIM on February 8, 2012. Plaintiff followed up with Dr. Sabit, and his office notes indicated that she had an excellent result and felt great. That was not true, and she continued to feel pain months later. By October 2012, Dr. Sabit was falsely reporting in his records that plaintiff had a complete resolution of her symptoms. Plaintiff testified that, in reality, she felt no improvement. In fact, her continuing back pain left her unable to work throughout most of 2011 through 2014. By 2015, she forced herself to return to work for financial reasons and found flexible employment that allowed her to make $25,500 that year. Nonetheless, she still struggled to get out of bed every day and her husband took over a majority of household upkeep and child rearing responsibilities.

Plaintiff testified that in February or March 2016, she began seeing neurosurgeon Dr. Jayant Jagannathan, who told her that an MRI did not reflect the procedures Dr. Sabit told her he performed. She underwent surgery with Dr. Jagannathan on March 24, 2016, and had not been able to return to work since then. Plaintiff believed her recovery from the March 24, 2016 surgery

progressed as expected. Dr. Jagannathan was still hopeful that she would continue to improve. Plaintiff was able to function to some extent at home, but she could not drive, rarely left the house, and no longer participated in her children's extracurricular activities or attended church. The ordeal had taken a toll on plaintiff's marriage, as she struggled with emotional turmoil and could not play much of a role with her family. Dr. Jagannathan recently performed a third surgery on plaintiff's back earlier in 2018. Plaintiff had been diagnosed with significant major depression and engaged in counseling, coupled with psychotropic medication, for the last year. Plaintiff felt "destroyed" by what she went through.

Dr. Jagannathan testified that he first consulted with plaintiff on March 10, 2016. Plaintiff reported persistent pain after a lumbar fusion performed by Dr. Sabit, but a CT myelogram did not reveal evidence of a lumbar interbody fusion, laminectomy, or placement of an interbody cage at L4-L5. The CT did, however, show an interspinous plate at L4-L5. Dr. Jagannathan operated on plaintiff on May 24, 2016. He noted disc degeneration at L4-L5 and decided to remove the interspinous plate and replace it, "along with doing the transforaminal lumbar interbody fusion with PEEK structural allograft at L4-[L]5." The plate he removed could have been used as part of a lumbar interbody fusion, but merely placing the plate without performing the necessary disc work would not suffice. During the surgery, Dr. Jagannathan was able to confirm that none of the procedures described in Dr. Sabit's operative report had actually been done. Dr. Jagannathan also explained that when a nerve has been pinched for four or five years without proper treatment, the chances of improvement are much lower. EMG studies suggested a possibility of permanent nerve damage. In the spring of 2018, Dr. Jagannathan operated on plaintiff again to decompress the area adjacent to the fusion level. Plaintiff continued to have persistent pain and was treating with one of Dr. Jagannathan's colleagues, a pain management specialist.

Plaintiff moved for a directed verdict against Dr. Sabit, arguing that there had been no defense proffered on his behalf, leaving only plaintiff's uncontroverted evidence regarding his violations of the standard of care and proximate causation. The trial court agreed and granted a directed verdict with respect to the standard of care, breach of the standard of care, and causation. After closing arguments were presented on behalf of plaintiff and Dr. Suleiman, SIM orally moved for separate juries. SIM argued that a fair trial on the negligent credentialing claim was impossible after the jury had been inundated with harsh criticisms of Dr. Sabit and implications that plaintiff had been left abandoned at SIM, unprotected and abused while she slept under anesthesia. The trial court opined that a second jury would still be exposed to the same information because it was a necessary component of proximate cause on the negligent credentialing claim. The court denied SIM's motion because there was nothing in the medical malpractice trial that would potentially prejudice SIM's defense of the negligent credentialing claim.

In the midst of trial, SIM also filed a written motion in limine to exclude its credentialing file from evidence. SIM acknowledged that the trial court had already denied a motion in limine from Dr. Suleiman regarding the same issue, but asked it to revisit the issue because MCL 333.20175(8) provided a statutory privilege protecting credentialing files from use at trial. According to SIM, although the trial court had previously determined that a similar statutory privilege for peer review materials did not apply to SIM because it was not a hospital, MCL 333.20175(8) applied to ambulatory surgical centers like SIM. The trial court viewed the motion as a motion for reconsideration and stated on the record that it did not intend to revisit the admissibility of the credentialing file.

As noted earlier, the jury determined that Dr. Suleiman was not professionally negligent. However, it still made findings regarding plaintiff's damages for purposes of the directed verdict against Dr. Sabit. With respect to past damages, the jury awarded plaintiff $104,000 for noneconomic damages, $104,000 for medical expenses, and $151,656 for loss of earning capacity. Next to each of these awards, the verdict form included a notation that said, "+12%." With respect to future damages, the jury also awarded plaintiff $5,000 per year from 2018 to 2055 for noneconomic damages, $18,000 per year from 2018 to 2055 for medical expenses, and $40,000 per year from 2018 to 2039 for loss of earning capacity. After the verdict was placed on the record, the trial court advised the jury for the first time that there would be a second phase of the trial regarding plaintiff's negligent credentialing claim against SIM.

Plaintiff first called Elaine DeBeaudry as an adverse or hostile witness. DeBeaudry testified that she no longer worked at SIM, but had previously been employed as its facility administrator during the early stages of this litigation. Part of her duties was to gather information regarding physicians who applied for staff privileges at SIM and point out any "red flags" or concerning material in the gathered information. DeBeaudry confirmed that she did not have specific experience in healthcare administration, but she did have a general background in management, nursing, and health sciences. She did not consider herself an expert in credentialing, but she was knowledgeable about preparing or gathering documentation for credentialing purposes.

Although she did not work at SIM when Dr. Sabit applied, DeBeaudry reviewed his file in connection with this case. Dr. Sabit reported that he previously had staff privileges at CMH, so a reference request was sent there. CMH required Dr. Sabit to execute an extensive release before it would disclose any information. Dr. Beaghler provided a written response after the release was returned. Dr. Beaghler reported that Dr. Sabit did not follow hospital rules, regulations, or bylaws; his privileges had been suspended; his practice had come under a focus review; and ongoing evaluations of his professional practices disclosed several concerns. It was evident that the foregoing issues were noticed by someone in the credentialing process, as they were underlined in a copy of the letter. DeBeaudry agreed that it would be logical and responsible to follow up with Dr. Beaghler, but she was unable to locate any evidence of additional contact with Dr. Beaghler. DeBeaudry agreed that SIM sent a letter to Dr. Sabit to inquire about some of the issues disclosed by Dr. Beaghler. The letter requested a written response, but there was no written response from Dr. Sabit in the credentialing file. DeBeaudry never saw a written response from Dr. Sabit and was not aware of one existing. Moreover, in SIM's later letter thanking Dr. Sabit for his "prompt response," there was no indication that the response was provided in writing, and it would not be uncommon for a credentialing committee to meet with an applicant in person to address certain concerns. DeBeaudry also explained that the National Practitioner Data Bank is a registry where claims against doctors are recorded, and it was used by healthcare facilities to help investigate a doctor's background. Although there were several entries regarding Dr. Sabit, none of them were recorded before SIM granted Dr. Sabit privileges.

Dr. John Charles Hyde, II, testified as an expert for plaintiff in credentialing and physician privileges. Dr. Hyde opined that SIM's decision makers were "totally uninformed," and if Dr. Sabit had been properly vetted, there would have been no basis to grant him privileges. Dr. Hyde believed his opinion was reinforced by the deposition testimony of Dr. Kenneth Lock, SIM's medical director in 2011. Dr. Lock's explanations about various pieces of information that

were not appropriately acted upon made it clear that he did not know the credentialing process. According to Dr. Hyde, several of Dr. Beaghler's disclosures were very alarming and required further scrutiny, including that (1) Dr. Sabit was on provisional status at the time of his resignation; (2) Dr. Sabit did not always comply with medical staff bylaws, rules, regulations, and other policies; (3) action was taken against Dr. Sabit's clinical privileges in the form of a brief summary suspension which generally occurs when there are patient safety concerns; (4) after Dr. Sabit resigned, his practice was the subject of a focus review which generally means the hospital had concerns for patient safety; and (5) ongoing professional practice evaluations revealed several concerns regarding Dr. Sabit. Dr. Hyde opined that the combination of these disclosures should have prompted SIM to do a very thorough investigation before granting Dr. Sabit privileges. Although it was possible that the allegations were not credible, SIM needed to follow up with CMH. Yet there was no evidence that anyone at SIM reached out to Dr. Beaghler or anyone else at CMH again. Additionally, SIM should have assessed Dr. Sabit's application to see if he truthfully disclosed the same issues. Had SIM done that, they would have noticed that Dr. Sabit falsely indicated that he had never had medical staff privileges suspended. Dr. Hyde opined that it was a gross violation of the credentialing process to rely on Dr. Sabit to clarify the details of Dr. Beaghler's disclosures, especially after Dr. Sabit made material misrepresentations in his application.

During his investigation of this case, Dr. Hyde discovered why CMH suspended Dr. Sabit. SIM objected to Dr. Hyde's testimony regarding this subject on hearsay, foundation, and relevancy grounds, but the trial court overruled the objections. Dr. Hyde explained that he came across an opinion from Dr. Sabit's lawsuit against CMH,[4] which stated that Dr. Sabit was suspended "to protect the life or wellbeing of patients and to reduce imminent danger to the life, health or safety of any person." It also referenced two specific instances in which Dr. Sabit did not render appropriate medical care. Although the opinion containing this information was not released until 2015, Dr. Hyde opined that Dr. Beaghler would have provided the same information if SIM had inquired. Dr. Sabit was suspended on December 3, 2010, so the information was part of his record with CMH at the time SIM was considering his application for privileges. Dr. Hyde believed the information would be within the scope of the comprehensive release CMH required before its initial disclosure. The opinion confirmed Dr. Hyde's suspicions about Dr. Beaghler's disclosures and demonstrated that more information was available well before SIM granted Dr. Sabit privileges.

On cross-examination, Dr. Hyde testified that Dr. Beaghler did not provide all the relevant information, even though the release CMH requested permitted him to do so. Dr. Hyde noted that CMH did not know what Dr. Sabit had already disclosed and would have assumed Dr. Sabit was forthcoming. Responding to this type of inquiry, a hospital would generally summarize information without providing a detailed explanation of everything in Dr. Sabit's record. At any rate, CMH provided enough information to prompt a reasonably intelligent and prudent administrator to follow up. Dr. Hyde agreed that Dr. Sabit's National Practitioner Data Bank

---

[4] The trial court denied plaintiff's motion to admit the opinion as an exhibit.

-8-

report was negative in May 2011, and that there were no lawsuits against Dr. Sabit pending in Ventura County at that time.

Dr. Kenneth Lock testified that he was the medical director and chairman of the medical executive committee at SIM in 2011. He had no formal training in healthcare administration. He was never directly employed or compensated by SIM; he merely agreed to help out because SIM had a young, small staff at the time. According to SIM's bylaws, the medical director was responsible for making recommendations to the board of directors regarding all applicants for staff privileges. Dr. Lock explained that "credentialing packet[s]" were processed and given to the board of directors for decision.

With respect to summary suspensions, Dr. Lock said, "I'm not sure I understand what summary suspension means." Plaintiff's counsel drew Dr. Lock's attention to SIM's bylaws regarding summary suspensions,[5] which used the term in a similar manner as Dr. Hyde. Even so, Dr. Lock could not say that he understood Dr. Sabit was suspended for reasons implicating patient safety because "I'm not sure I remember reading that letter from way back 6 years ago." Dr. Lock did not know if he underlined the criticisms in Dr. Beaghler's letter, but explained, "[H]ad I seen a letter like that I would immediately bring it to the Board's attention so that they could deal with it . . . ." Although Dr. Lock did not remember Dr. Beaghler's letter, he agreed that he must have read it because he referenced it in a subsequent letter to Dr. Sabit.

Dr. Lock agreed that he did not contact Dr. Beaghler at all. Instead, he wrote to Dr. Sabit to ask for clarification regarding the allegation of bylaw or rule violations. In 2011, Dr. Lock was not familiar with the significance of a summary suspension, and he did not ask Dr. Sabit to explain that disclosure. When asked why he did not inquire about issues other than the purported rule violations, Dr. Lock said, "Because I told you, I'm doing this as a helpful basis," and it was up to the board of directors to decide whether to grant privileges. Dr. Lock believed that his responsibilities as medical director were limited to making sure the board of directors had information to make its own decisions. When Dr. Sabit was granted privileges, Dr. Lock wrote a letter that thanked Dr. Sabit for his response. Dr. Lock assumed Dr. Sabit provided a written response, which would have been given to the board of directors with the rest of Dr. Sabit's file, but Dr. Lock did not recall ever seeing Dr. Sabit's response. Dr. Lock explained that he did not

---

[5] SIM's bylaws stated:

> Summary Suspension Criteria for Initiation. Whenever a practitioner's conduct requires that immediate action be taken . . . to protect the life of any patient or reduce the substantial likelihood of immediate injury or damage to the health or safety of any patient, employee or other person present in the facility, or the practitioner fails to report to the Medical Director and Administrator a loss of privileges or any corrective actions pending against the practitioner at any other healthcare facilities, either the Medical Director or the governing body shall have the authority to suspend summarily the medical staff membership status and any and all portion of clinical privileges of such practitioner.

make a recommendation regarding Dr. Sabit and was not involved in the vote regarding his application.

SIM called only one defense witness: Dr. Mahmood Hai, one of SIM's founders and the executive director and president of the board of directors. Dr. Hai had participated in SIM's credentialing process since it first opened, including the decision to grant Dr. Sabit privileges. Dr. Hai indicated that he reviewed Dr. Sabit's National Practitioner Data Bank report, which was clean in May 2011. Additionally, Dr. Sabit had received a full license to practice in Michigan in January 2011 and, according to Dr. Hai, "the Licensing Board checks everything out before they give a license." Other than Dr. Beaghler's letter, there was nothing negative in Dr. Sabit's file, and SIM was also aware that Dr. Sabit had been given privileges at several hospitals in the area. "So all that confirmed that everybody has checked him through, so it was easy for us to say that there was nothing negative at that point."

Dr. Hai did not believe that anything in Dr. Beaghler's letter was alarming or justified denying Dr. Sabit's application for privileges. Dr. Hai explained that summary suspensions are common when physicians fall behind on their paperwork or charts; such suspensions are used as an enforcement mechanism to make sure records are completed so services can be billed. Moreover, Dr. Beaghler indicated that there were no disciplinary actions pending against Dr. Sabit, nor did he ask for a phone call or suggest Dr. Sabit had a major problem at CMH. Dr. Hai testified that there was "absolutely no indication [from Dr. Beaghler] that we needed to pursue anything further." After seeing Dr. Beaghler's letter, the board of directors decided to interview Dr. Sabit in person to determine what happened at CMH. From his response and the rest of the credentialing file, the board of directors saw no reason to follow up with Dr. Beaghler. Dr. Hai summarized: "[Dr. Sabit] had been practicing for 7, 8 years. He had [a] Michigan license, he had [a] California license, he has [a] license in New Jersey, and there was nothing outstanding that we could see in paper."

On cross-examination, Dr. Hai testified that he did not think Dr. Sabit lied to SIM; the discrepancies between his disclosures and the matters in Dr. Beaghler's letter could have been a matter of differing terminology. Dr. Sabit told the board he was suspended because of problems with medical records, which the board considered acceptable. Dr. Hai questioned why Dr. Beaghler would not have indicated that Dr. Sabit was suspended for patient safety concerns if that was the true reason. Dr. Hai reiterated that SIM looked at all the relevant information at the time of its decision and reasoned that Dr. Sabit simply went "rogue" later. As evidence that SIM performed its due diligence, Dr. Hai continued to emphasize that other facilities cleared Dr. Sabit for privileges as well and the state of Michigan granted Dr. Sabit a license. Dr. Hai also opined that if SIM had denied Dr. Sabit's application, it would not have caused his privileges elsewhere to be revoked.

The jury determined that SIM negligently credentialed Dr. Sabit and that the negligent credentialing was a proximate cause of plaintiff's injuries. On November 14, 2018, plaintiff moved for entry of a judgment against SIM, Dr. Sabit, and MBSPG, jointly and severally. Plaintiff opined that she was entitled to $630,431.04 in present damages, and $1,691,000 in future damages reduced to a present value of $1,038.540.74, for a total award of $1,668.971.78, less any expenses paid or payable by a collateral source, namely, the Social Security Administration. In support of her motion, plaintiff submitted a report from Nitin V. Paranjpe, Ph.D., regarding the foregoing

calculations and Dr. Paranjpe's curriculum vitae reflecting his background in economics. SIM objected on several grounds, including its assertion that the amounts awarded by the jury for past damages included interest within the stated figures. SIM argued that the jury's "+12%" notation should be ignored because it was specifically instructed to include any applicable precomplaint interest in the amount awarded. SIM also argued that it was inappropriate to enter a judgment against SIM, Dr. Sabit, and MBSPG, jointly and severally, when Dr. Sabit's liability was premised on his default.

At oral argument on November 29, 2018, SIM explained that it was inappropriate to apply a 12% interest rate to the past damages awards because the amount awarded for each category of damages included damages from the date of plaintiff's injury to the time of trial, while precomplaint interest was only applicable to the period between an injury and the filing of a complaint. SIM argued that the court could not assume that the jury would have calculated damages and interest in the same manner as plaintiff's economist. In response, plaintiff argued that the jury was properly instructed and that the 12% interest was clearly intended to apply only to the precomplaint period, consistent with the court's instructions. The court agreed that the "+12%" interest notation could be interpreted in more than one way and asked the parties for additional briefing regarding potential conflicts between jury instructions and a verdict form.

In their supplemental briefing, plaintiff argued that the trial court was obligated to ascertain and implement the jury's intent, which was to add 12% precomplaint interest to the amounts awarded for past damages, while SIM argued that it was impossible to harmonize the jury's attempt to award precomplaint interest with its failure to designate which portion of past damages were attributed to the precomplaint time frame. The trial court ultimately determined that the jury intended to comply with its instructions, which required it to include only precomplaint interest, and therefore construed the verdict as awarding 12% interest from February 8, 2012 (date of surgery) through December 1, 2016 (plaintiff's complaint). The court then entered a judgment against Dr. Sabit, MBSPG, and SIM, jointly and severally. The judgment includes detailed calculations of each category of damages, interest, setoffs, and present value reductions, resulting in a total judgment of $1,284.995.78.

SIM filed several postjudgment motions in which it sought a judgment notwithstanding the verdict (JNOV) or, alternatively, a new trial, arguing that (1) the credentialing file regarding Dr. Sabit was privileged and inadmissible; (2) Michigan does not recognize a negligent credentialing cause of action; (3) Dr. Hyde's testimony was inadmissible and failed to establish negligence and proximate cause because it lacked a sufficient factual basis in record evidence; (4) SIM was denied a fair trial because the court refused to seat a second jury for the negligent credentialing claim, SIM was not able to participate in voir dire, and the jury was exposed to inadmissible and prejudicial information about Dr. Sabit; (5) the jury's award of future medical expenses was speculative and excessive; (6) the jury's attempt to award precomplaint interest could not be harmonized with its failure to distinguish between precomplaint and postcomplaint damages; and (7) the adverse inference jury instruction was unsupported by evidence. The trial court entertained oral argument regarding these matters on March 20, 2019, and denied each motion in a series of orders entered June 25, 2019. This appeal followed.

## II. ANALYSIS

### A. THE CREDENTIALING FILE WAS ADMITTED IN ERROR

SIM first argues that its credentialing file regarding Dr. Sabit was privileged under both MCL 333.20175(8) and MCL 333.21515; thus, it should not have been produced and then admitted as evidence at trial. We agree.

### 1. STANDARD OF REVIEW

A trial court's evidentiary rulings are generally reviewed for an abuse of discretion, but preliminary questions of law are reviewed de novo. *Mueller v Brannigan Bros Restaurants & Taverns LLC*, 323 Mich App 566, 571; 918 NW2d 545 (2018). "An abuse of discretion generally occurs only when the trial court's decision is outside the range of reasonable and principled outcomes, but a court also necessarily abuses its discretion by admitting evidence that is inadmissible as a matter of law." *Hecht v Nat'l Heritage Academies, Inc*, 499 Mich 586, 604; 886 NW2d 135 (2016) (citations omitted). A trial court's denial of a motion for JNOV is reviewed de novo. *Id*. "This Court reviews for an abuse of discretion a trial court's ultimate decision whether to grant a new trial, but considers de novo any questions of law that arise." *Moore v Detroit Entertainment, LLC*, 279 Mich App 195, 223; 755 NW2d 686 (2008) (quotation marks and citation omitted).

Issues of statutory interpretation are reviewed de novo. *Krusac v Covenant Med Ctr, Inc*, 497 Mich 251, 255; 865 NW2d 908 (2015). The goal of statutory interpretation is to give effect to the Legislature's intent, as discerned from the plain language of the statute. *Id*. at 255-256. Unambiguous statutory language must be enforced as written and no judicial construction is required or permitted. *Id*. at 256.

### 2. DISCUSSION

SIM's credentialing file regarding Dr. Sabit was protected by a statutory peer review privilege under MCL 333.20175(8) and MCL 333.21515. The trial court erred by compelling its production and admitting it at trial.

Article 17 of the Public Health Code generally governs licensing and regulation of health facilities and agencies. See MCL 333.20101 *et seq*. A "health facility or agency" is a broad term encompassing several types of entities, including freestanding surgical outpatient facilities and hospitals. MCL 333.20106(1)(c) and (f). It is undisputed that SIM is a freestanding surgical outpatient facility, as defined by MCL 333.20104(7),[6] and therefore also a health facility or agency under MCL 333.20106(1)(c).

---

[6] " 'Freestanding surgical outpatient facility' means a facility, other than the office of a physician, dentist, podiatrist, or other private practice office, offering a surgical procedure and related care that in the opinion of the attending physician can be safely performed without requiring overnight

The general provisions of Article 17 include § 20175(8), which states:

> The records, data, and knowledge collected for or by individuals or committees assigned a professional review function in a health facility or agency, or an institution of higher education in this state that has colleges of osteopathic and human medicine, are confidential, shall be used only for the purposes provided in this article, are not public records, and are not subject to court subpoena. [MCL 333.20175(8).]

MCL 333.21515 similarly provides, "The records, data, and knowledge collected for or by individuals or committees assigned a review function described in this article are confidential and shall be used only for the purposes provided in this article, shall not be public records, and shall not be available for court subpoena." The question before this Court is whether the materials gathered by a freestanding surgical outpatient facility in the process of determining whether to grant privileges to an applicant are entitled to either or both statutory privileges.

In *Attorney General v Bruce*, 422 Mich 157; 369 NW2d 826 (1985), our Supreme Court considered whether records from a hospital's peer review committee could be compelled pursuant to an investigative subpoena. *Id*. at 161. After conducting an internal investigation of a staff physician following the death of a patient, the defendant hospital suspended the physician's privileges for six months. *Id*. at 162. The defendant notified the Michigan Board of Medicine of its decision, but refused to turn over information developed in the internal investigation when the Board began its own investigation of the incident. *Id*. The Court observed that the Public Health Code imposed a duty on the owner, operator, and governing body of a hospital to

> assure that physicians admitted to practice in the hospital are organized into a medical staff to enable an effective review of the professional practices in the hospital for the purpose of reducing morbidity and mortality and improving the care provided in the hospital for patients. This review shall include the quality and necessity of the care provided and the preventability of complications and deaths occurring in the hospital. [*Id*. at 164, quoting MCL 333.21513(d).]

Under MCL 333.21513, a hospital was required to conduct peer review activities, and the Court opined that the unambiguous language of the section immediately following MCL 333.21513, i.e., the statutory privilege outlined in MCL 333.21515, constituted a clear expression of the Legislature's intent to preclude "peer review committee records" from disclosure, even in the context of an investigation by the Board under other articles of the Public Health Code. *Id*. at 165-166.

Nearly a decade later, this Court considered the statutory privilege in the context of a medical malpractice action involving a negligent credentialing theory. *Dye v St John Hosp & Med Ctr*, 230 Mich App 661, 663-664; 584 NW2d 747 (1998). The defendant hospital in *Dye* objected

---

inpatient hospital care. Freestanding surgical outpatient facility does not include a surgical outpatient facility owned and operated as part of a hospital." MCL 333.20104(7).

-13-

to the plaintiff's request for a physician's "personnel/privileges file," relying on MCL 333.21515, as well as MCL 333.20175(8). *Id*. at 664, 665-666. The defendant argued that because the materials were collected by or for its credentialing committee, "which exercise[d] a professional review function," the materials were not discoverable. *Id*. at 666-667. This Court found the defendant's position persuasive, agreeing that it was supported by the plain meaning of the statutory privilege. *Id*. at 667, 673. In reaching that conclusion, the Court rejected the plaintiff's contention that the privilege did not extend to materials used in deciding whether to grant staff privileges in the first instance, as opposed to a retrospective review of a past event or issue. *Id*. at 667-669. Recognizing the precedent established in *Attorney General* and *Dye*, this Court again confirmed in *Johnson v Detroit Med Ctr*, 291 Mich App 165, 168; 804 NW2d 754 (2010), that "a credentialing committee is a peer review committee" to which a privilege is afforded.

Although each of these cases involved hospitals, rather than a freestanding surgical outpatient facility like SIM, the analogous language establishing each health facility or agency's duties is significant. Under MCL 333.21513,

> The owner, operator, and governing body of a hospital licensed under this article:
>
> * * *
>
> (c) Shall assure that physicians and dentists admitted to practice in the hospital are granted hospital privileges consistent with their individual training, experience, and other qualifications.

Similarly, under MCL 333.20813,

> The owner, operator, and governing body of a freestanding surgical outpatient facility licensed under this article:
>
> * * *
>
> (c) Shall assure that physicians admitted to practice in the facility are granted professional privileges consistent with the capability of the facility and with the physicians' individual training, experience, and other qualifications.

Under both MCL 333.21513(c) and MCL 333.20813(c), the hospital and freestanding surgical outpatient facility, respectively, must ensure that professionals are only granted privileges consistent with their training, experience, and other qualifications. As our Supreme Court has observed, one of the measures enacted by the Legislature to promote candid assessment in peer review proceedings is the statutory privilege that shields the "records, data, and knowledge collected for or by peer review entities" from discovery. *Feyz v Mercy Mem Hosp*, 475 Mich 663, 680-681; 719 NW2d 1 (2006), citing MCL 333.21515 and MCL 333.20175(8). Nothing in the pertinent language of MCL 333.20175(8) suggests that the privilege does not extend to a freestanding surgical outpatient facility exercising the same credentialing review function under MCL 333.20813(c) that a hospital performs under MCL 333.21513(c). To the contrary, MCL 333.20175(8) applies to materials "collected for or by individuals or committees assigned a professional review function in a *health facility or agency . . . .*" (Emphasis added.) As noted

-14-

earlier, the parties do not dispute that SIM is a freestanding surgical outpatient facility, and MCL 333.20106(1)(c) includes a freestanding surgical outpatient facility within the definition of a health facility or agency.

The applicability of MCL 333.21515 presents a closer question. Unlike MCL 333.20175(8), MCL 333.21515 does not use "health facility or agency" terminology that, by definition, encompasses a freestanding surgical outpatient facility. Instead, the privilege established by MCL 333.21515 extends to "records, data and knowledge collected for or by individuals or committees assigned a review function described in this article . . . ." The article referenced in this provision is Article 17, which governs a wide variety of health facilities or agencies, including freestanding surgical outpatient facilities. However, the specific provision is set forth in Part 215 of Article 17, which addresses matters related to the narrower category of entities that constitute hospitals.

However, the first sections of both Part 215 (regarding hospitals) and Part 201 (the general provisions applicable to Article 17) incorporate the principles of construction set forth in Article 1 of the Public Health Code. See MCL 333.20101(2) and MCL 333.21501(2). Section 1113 of Article 1 provides, "A heading or title of an article or part of this code shall not be considered as part of this code or be used to construe the code more broadly or narrowly than the text of the code sections would indicate, but shall be considered as inserted for convenience to users of this code." MCL 333.1113. Given the Legislature's express warning against relying on a heading or title to alter the plain meaning of the statutory language in the Public Health Code, the mere fact that MCL 333.21515 falls within a part with the heading "Hospitals," should not be unduly persuasive.

On the whole, we conclude that despite the placement of MCL 333.21515 in Part 215 alongside other provisions applicable to hospitals, the Legislature's reference to the review functions described in Article 17, as opposed to Part 215, evidences its intent to extend the statutory privilege for peer review materials to all health facilities and agencies with review functions imposed by Article 17. The credentialing process a freestanding surgical outpatient facility performs to satisfy its duty under MCL 333.20813(c) is a review function described and required by Article 17. See *Johnson*, 291 Mich App at 168 ("[A] credentialing committee is a peer review committee."). As such, the peer review privilege in MCL 333.21515 applies to SIM. But even if SIM's credentialing file regarding Dr. Sabit was not protected by MCL 333.21515, it was clearly privileged under MCL 333.20175(8). The plain language of MCL 333.20175(8) limited the use of those materials to purposes provided in Article 17. Accordingly, the file was not subject to discovery and should not have been admitted at trial.

## B. PLAINTIFF DID NOT ESTABLISH A PRIMA FACIE CASE FOR NEGLIGENT CREDENTIALING BASED ON ADMISSIBLE EVIDENCE

SIM also argues that it was entitled to JNOV because Michigan does not recognize negligent credentialing as a cause of action. SIM further argues that, if a negligent credentialing cause of action exists, it sounds in medical malpractice and Dr. Hyde's testimony could not establish the standard of care and proximate causation; rather, his testimony was speculative, unreliable, and inadmissible because it lacked a factual basis in the record. We need not decide the first issue because we conclude, even assuming that a negligent credentialing theory may be pursued, and construing the evidence and all legitimate inferences in the light most favorable to

-15-

plaintiff, that plaintiff failed to establish the standard of care and proximate causation, and that SIM is accordingly entitled to entry of a judgment notwithstanding the verdict.

## 1. STANDARD OF REVIEW AND GENERAL PRINCIPLES

Evidentiary rulings are generally reviewed for an abuse of discretion, *Mueller*, 323 Mich App at 571, which occurs when the trial court's ruling falls "outside the range of reasonable and principled outcomes," *Hecht*, 499 Mich at 604. We review de novo a trial court's decision regarding a motion for JNOV. *Id.* A motion for JNOV should be granted when the evidence, viewed in the light most favorable to the nonmovant, fails to establish a claim as a matter of law. *Attard v Citizens Ins Co of America*, 237 Mich App 311, 321; 602 NW2d 633. MCR 2.611(A)(1) sets forth the grounds upon which a jury verdict may be set aside and a new trial granted. See *Kelly v Builders Square, Inc*, 465 Mich 29, 38; 632 NW2d 912 (2001). In pertinent part, the rule permits a new trial when a party's substantial rights are materially affected by "[i]rregularity in the proceedings of the court, jury, or prevailing party, or an order of the court or abuse of discretion which denied the moving party a fair trial." MCR 2.611(A)(1)(a).

Assuming that a negligent credentialing theory may be asserted, it falls within the scope of a medical malpractice claim, because it arises from action occurring in the scope of a professional relationship and raises questions of judgment beyond common knowledge and experience. See *Bryant v Oakpointe Villa Nursing Centre, Inc*, 471 Mich 411, 422; 684 NW2d 864 (2004) (discussing characteristics that distinguish medical malpractice from general negligence). Generally, medical malpractice claims require expert testimony regarding the appropriate standard of care and causation. *Woodard v Custer*, 473 Mich 1, 6; 702 NW2d 522 (2005); *Teal v Prasad*, 283 Mich App 384, 394; 772 NW2d 57 (2009). Under MRE 703, "[t]he facts or data in the particular case upon which an expert bases an opinion or inference shall be in evidence." See also *Teal*, 283 Mich App at 395 ("[T]here must be facts in evidence to support the opinion testimony of an expert.") (quotation marks and citation omitted; alteration in original).

## 2. DISCUSSION

SIM argues that it is entitled to JNOV because of the improper admission of the credentialing file. Nearly all of the testimony offered during the negligent credentialing portion of the trial related to the contents of the credentialing file, primarily Dr. Beaghler's letter and SIM's reaction to it.[7] Most of Dr. Hyde's testimony was therefore premised on facts that were not properly in evidence. Because Dr. Hyde was the only expert to testify regarding the applicable standard of care and proximate cause, his testimony was critical to plaintiff's case. Without the admission of the credentialing file upon which the majority of Dr. Hyde's testimony depended, plaintiff's claim for medical malpractice should not have been submitted to the jury. See *Attard*, 237 Mich App at 321.

---

[7] Plaintiff claims that "Dr. Beaghler's letter to SIM was admitted by stipulation, in lieu of the attorneys' [sic] traveling to California to attempt to depose him." But there is no evidence of any such stipulation in the record. To the contrary, SIM raised numerous objections regarding Dr. Beaghler's absence and the hearsay contents of his letter at trial.

-16-

The vast majority of Dr. Hyde's testimony focused on the implications of Dr. Beaghler's disclosures and Dr. Hyde's belief that the nature of the disclosures required further investigation. SIM argues that this was not an appropriate basis for Dr. Hyde's testimony because Dr. Beaghler's letter was part of the inadmissible credentialing file and, even if the credentialing file had been admissible, the statements in Dr. Beaghler's letter were inadmissible hearsay. Although plaintiff makes no attempt to dispute SIM's characterization of the letter as hearsay, we are not persuaded by that aspect of SIM's argument. By definition, an out-of-court statement is only considered hearsay if it is "offered in evidence to prove the truth of the matter asserted." MRE 801(c). When the statement is offered to establish its effect on the person to whom the statement is made, it is not precluded by the rule against hearsay. *People v Fisher*, 449 Mich 441, 449-450; 537 NW2d 577 (1995). See also *Westland v Okopski*, 208 Mich App 66, 77; 527 NW2d 780 (1994) (concluding that 911 call was not hearsay when it was offered to show why the police responded to a disturbance). The relevance of Dr. Beaghler's letter was not to prove the truth of the disclosures—the alleged deficiencies in Dr. Sabit's performance at CMH were of no moment to this case. Rather, the logical significance of the letter was the effect the disclosures had on SIM's decision to grant Dr. Sabit privileges. As such, the disclosures were not inadmissible hearsay.

Nonetheless, as explained above, the credentialing file was inadmissible. Although Dr. Beaghler's letter was not automatically inadmissible on this basis, see *Dye*, 230 Mich App at 674 n 11 ("[P]lacement of a document within such a file does not protect its discovery if available from another source."), there is no indication that plaintiff acquired the letter from a source independent of the credentialing file. To the contrary, when plaintiff attempted to depose Dr. Beaghler and sent a notice requesting production of the May 19, 2011 letter and other documents, Dr. Beaghler refused to comply with the request. On this record, there is no indication that plaintiff would have acquired the letter from a different source.[8] At any rate, the only basis for admission of Dr. Beaghler's letter at trial was as part of the credentialing file that should have been excluded from evidence under MCL 333.20175(8) and MCL 333.21515. Thus, Dr. Hyde's testimony about the significance of Dr. Beaghler's disclosures and the steps SIM should have taken in response to the letter was not based on facts in evidence, contrary to MRE 703.

Over SIM's objection, Dr. Hyde was also permitted to testify about the reasons for Dr. Sabit's suspension, which he discovered in an opinion issued by the California Court of Appeals in 2015. In pertinent part, the opinion states that on December 3, 2010, CMH informed Dr. Sabit "that it was summarily suspending his provisional staff privileges at the Hospital 'to protect the life or well-being of patients [and] to reduce imminent danger to the life, health or safety of any person.'" *Sabit v Abou-Samra*, unpublished opinion of the California Court of Appeals for the Second District, issued April 30, 2015 (Docket No. B249793), p 1 (alteration in original). According to *Sabit*, the written notice of Dr. Sabit's suspension also "referred to two instances where Sabit allegedly did not render appropriate medical care to patients." *Id.* Dr. Hyde

---

[8] Indeed, at a June 30, 2017 hearing on plaintiff's motion to compel (which was granted), counsel for plaintiff stated with regard to the negligent credentialing claim, "the only way we're going to prove it is by looking at the credentialing file." Generally, a party that has taken a legal position and prevailed in an earlier proceeding may not assert a contrary position in the same or related litigation. See *Michigan Gas Utilities v PSC*, 200 Mich App 576, 583; 505 NW2d 27 (1993).

reasoned that because Dr. Sabit was suspended many months before he applied for privileges at SIM, these matters were well known to CMH in May 2011 and Dr. Beaghler would have disclosed the reason for the suspension if SIM had made further inquiries in response to Dr. Beaghler's letter.

SIM maintains on appeal that this portion of Dr. Hyde's testimony also lacked a factual basis in record evidence and was speculative in the absence of testimony from Dr. Beaghler. But Dr. Hyde's opinion about what Dr. Beaghler would have disclosed upon further inquiry may not necessarily be considered unduly speculative. As Dr. Hyde noted, the information was certainly available to Dr. Beaghler in May 2011. Dr. Hyde explained that hospitals commonly provide succinct summaries of information in an initial response to inquiries from other facilities about its staff, so the mere fact that Dr. Beaghler did not explain the reasons for the suspension in the May 19, 2011 letter is not conclusive. Moreover, while Dr. Beaghler demonstrated reluctance to participate in this litigation, any inquiries SIM made in 2011 would have been as part of the credentialing process. It appears that hospitals and other health facilities and agencies commonly share information about a physician's history for credentialing purposes even when they would not do so in the context of litigation, so much so that the Legislature has granted immunity for such disclosures. See *Feyz*, 475 Mich at 681, citing MCL 331.531. But even if Dr. Hyde's testimony regarding this matter was not speculative, SIM is correct that the reason for Dr. Sabit's suspension was not a fact in evidence. Dr. Hyde's testimony regarding that matter was therefore improper under MRE 703.

Dr. Hyde was the only expert witness to testify about the standard of care and proximate cause at issue in the negligent credentialing portion of the trial. Without his testimony, plaintiff could not have established a prima facie case of negligent credentialing. The improper admission of his expert opinion without a sufficient factual basis in record evidence affected SIM's substantial rights, and affirming a verdict and judgment premised largely on inadmissible evidence would be inconsistent with substantial justice. See *Mitchell*, 321 Mich App at 157-158; *Lewis*, 258 Mich App at 200; *Miller*, 244 Mich App at 531-532. SIM therefore argues that JNOV is warranted because, without the credentialing file, there was insufficient evidence to create a jury question. We agree. Although evidentiary errors are not ordinarily grounds for reversal, such relief is appropriate when "a substantial right of a party is affected and it affirmatively appears that failure to grant relief is inconsistent with substantial justice." *Lewis v LeGrow*, 258 Mich App 175, 200; 670 NW2d 675 (2003) (citations omitted). When a trial court errs with respect to critical evidence, the error cannot be deemed harmless. See *Mitchell v Kalamazoo Anesthesiology, PC*, 321 Mich App 144, 157-158; 908 NW2d 319 (2017) (vacating judgment on jury verdict when trial court restricted questions regarding genuineness and reliability of key evidence); *Miller v Hensley*, 244 Mich App 528, 531-532; 624 NW2d 582 (2001) (improper admission of police officers' testimony about fault for motor vehicle accident required reversal of judgment). We therefore conclude that the judgment against SIM must be vacated.

Further, had the trial court not granted plaintiff's motion to compel discovery of the credentialing file, and subsequently denied SIM's motion to strike plaintiff's expert testimony, SIM would have been entitled to judgment as a matter of law before trial even began. See MCL 600.2169(1); MCR 2.116(C)(10); *Nelson v American Sterilizer Co*, 223 Mich App 485, 488-489; 566 NW2d 671 (1997) (holding that, because the trial court struck the testimony of the plaintiff's two experts regarding her liver disorder, plaintiff was left "with no evidence of

causation" and "could not establish a prima facie case" with regard to that disorder; the trial court therefore correctly granted summary disposition to defendants regarding those claims).

Indeed, SIM filed a pre-trial motion for summary disposition with respect to plaintiff's negligent credentialing claim. Following a July 19, 2018 hearing, the trial court denied that motion on the basis of plaintiff's proffer of its expert witness testimony. Because that proffer was based on the contents of the inadmissible credentialing file, the trial court should have granted SIM's motion for summary disposition. This Court has held that "there is no different standard of review regarding [a] summary disposition motion, [a] motion for a directed verdict, and [a] JNOV motion" when there is no "genuine and material difference" in the evidence underlying each motion. See *Crown Technology v Detroit & Northern Bank*, 242 Mich App 538, 546 n 3; 619 NW2d 66 (2000); see also *Taylor v Kent Radiology*, 286 Mich App 490, 510; 780 NW2d 900 (2009) (noting that "if defendants felt that plaintiffs did not have the evidence to support their burden of proof for a traditional medical malpractice claim, defendants should have moved for *summary disposition*, *directed verdict*, *or JNOV* on the basis that plaintiffs' evidence was insufficient to prove by a preponderance that Bixler's malpractice caused Taylor's injuries") (emphasis added). Thus, we vacate the judgment against SIM and remand for entry of a judgment in favor of SIM.[9]

### III. CONCLUSION

In summary, the trial court improperly ordered the production and admission of SIM's credentialing file. That evidence should have been excluded. The evidence was otherwise insufficient to meet plaintiff's burden of proof regarding the standard of care and proximate cause.

---

[9] We therefore need not reach the remaining issues that are raised on appeal. We do note, however, that but for our determination that judgment should be entered in favor of SIM, we would in any event have reversed and remanded for a new trial, given that SIM was entirely excluded from participation in voir dire. "Voir dire is the process by which litigants may question prospective jurors so that challenges to the prospective jurors can be intelligently exercised." *Bynum v ESAB Group, Inc*, 467 Mich 280, 283; 651 NW2d 383 (2002). Voir dire must be calculated to facilitate that purpose. See *Fedorinchik v Stewart*, 289 Mich 436, 438-439; 286 NW 673 (1939) ("It is indispensable to a fair trial that a litigant be given a reasonable opportunity to ascertain on the voir dire whether any of the jurors summoned are subject to being challenged for cause or even peremptorily."). "A litigant's right to trial before an impartial jury . . . requires that he be given an opportunity to obtain the information necessary to challenge . . . individuals for cause or peremptorily." *Bunda v Hardwick*, 376 Mich 640, 659; 138 NW2d 305 (1965), citing Const 1963, art 1, § 14. MCR 2.511 sets forth the procedures for jury selection, including the process of exercising challenges for cause or peremptorily. When the procedures are not followed, "a party need not demonstrate prejudice arising from a claim of defective jury selection, since the requirement would impose an impossible burden." *Leslie v Allen-Bradley Co, Inc*, 203 Mich App 490, 493-494; 513 NW2d 179 (1994).

Reversed and remanded for entry of judgment in favor of SIM. We do not retain jurisdiction.

/s/ Mark T. Boonstra
/s/ Mark J. Cavanagh
/s/ Michael F. Gadola