*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

KATIE M. HOWARD-REED,

        Plaintiff-Appellant/Cross-Appellee,

UNPUBLISHED
May 19, 2022

v

BARRY BRAVER, D.O., BARRY BRAVER, D.O.,
PC, and MORANG CHESTER CLINIC, PC

        Defendants-Appellees/Cross-
        Appellants.

No. 356200
Wayne Circuit Court
LC No. 18-006367-NH

Before: JANSEN, P.J., and CAVANAGH and RIORDAN, JJ.

PER CURIAM.

In this medical malpractice action, plaintiff appeals as of right the trial court's order dismissing all claims against defendants after, first, the court granted defendants' motion to strike plaintiff's standard-of-care expert, Dr. Lily Lam, D.O., next, ruled that the testimony of plaintiff's causation expert, Dr. Paul Bader, was inadmissible because it was not based on sufficient facts or data and was not the product of reliable principles and methods, and then, accordingly, granted defendants' motion for summary disposition under MCR 2.116(C)(10). Defendants cross-appeal the trial court's denial in part of its motion for summary disposition on other grounds. We affirm the trial court in all respects.

## I. FACTS AND PROCEEDINGS

Defendant Dr. Barry Braver, D.O., is a specialist in family practice medicine and was plaintiff's primary care physician. Plaintiff developed renal cancer in 2006 resulting in the removal of her left kidney. After the surgery, she regularly visited Dr. Braver. In September 2015, Dr. Braver ordered a routine abdominal CT scan without contrast to check for recurrence or spread of the renal cancer. The CT scan was performed on December 9, 2015. The CT scan showed a mass forming in plaintiff's pancreas. Between December 2015 and June 2017, plaintiff had nine office visits with Dr. Braver, but he failed to inform her of the results of the December 2015 CT scan and failed to follow up with additional diagnostic tests and treatment.

In June 2017, Dr. Braver ordered another routine abdominal CT scan, which was performed on June 2, 2017. It showed a small increase in the size of the pancreatic mass and lesions in the liver. Plaintiff was treated with the drug Votrient then with Whipple procedure surgery to remove the head of her pancreas. She underwent liver ablations to treat the cancer in the liver.

On June 6, 2018, plaintiff brought this malpractice action alleging that Dr. Braver's failure to follow up with the December 2015 CT scan cost her the opportunity to timely treat the metastasis of her cancer. She alleged that there was a greater than 50 percent likelihood of a more favorable outcome if the cancer recurrence had been timely diagnosed and treated.

Plaintiff chose Dr. Lily Lam, D.O., as her expert witness on the standard of care for family practice specialists, and Dr. Paul Bader, M.D., as her causation expert. Defendants moved to strike Dr. Lam on the ground that the majority of her professional time was not devoted to the instruction or practice of family medicine in the year before Dr. Braver's alleged malpractice. The trial court granted the motion and denied plaintiff's request to amend her witness list to add a new standard-of-care expert. Defendants also moved for summary disposition under MCR 2.116(C)(10) on the ground that Dr. Bader's opinions regarding a causal connection between Dr. Braver's alleged malpractice and plaintiff's alleged loss of an opportunity for a more favorable outcome was not based on reliable science.

Dr. Bader opined that the progression of metastasis from a solitary site to two or more sites diminished the five-year survival rate by more than 50 percent. Defendants argued that this opinion was not supported by the medical literature. The trial court agreed with defendants that Dr. Bader's opinion was not the product of reliable principles and methods. However, the trial court did not agree with defendants' argument that the factual issue whether cancer spread to plaintiff's liver before or after December 2015 was speculative, and thus not a jury-triable issue. Regardless, because the trial court's rulings precluded plaintiff from establishing her malpractice claim through expert testimony, the court granted defendants summary disposition under MCR 2.116(C)(10).

## II. DISQUALIFICATION OF DR. LAM

Plaintiff first argues that the trial court erred by disqualifying Dr. Lam as a standard-of-care expert. We disagree.

"This Court reviews for an abuse of discretion the 'qualification of a witness as an expert and the admissibility of the testimony of the witness . . . .' " *Lenawee Co v Wagley*, 301 Mich App 134, 161; 836 NW2d 193 (2013), quoting *Surman v Surman*, 277 Mich App 287, 304-305; 745 NW2d 802 (2007). "An abuse of discretion occurs when a circuit court chooses a result that falls outside the range of reasonable and principled outcomes." *Lenawee Co*, 301 Mich App at 162. Any preliminary questions of law, including the interpretation and application of statutes, are reviewed de novo. *Mueller v Brannigan Bros Restaurants & Taverns, LLC*, 323 Mich App 566, 571; 918 NW2d 545 (2018). "Although trial courts have considerable discretion in determining whether a witness is qualified to testify as an expert, trial courts must nevertheless accurately apply the law in exercising their discretion." *Gay v Select Specialty Hosp*, 295 Mich App 284, 291; 813 NW2d 354 (2012). "[T]his Court reviews de novo whether the trial court correctly selected, interpreted, and applied the law." *Id*. "[W]hen a trial court admits or excludes evidence on the

basis of an erroneous interpretation or application of law, it *necessarily* abuses its discretion." *Id.* at 292.

"In a medical malpractice case, plaintiff bears the burden of proving: (1) the applicable standard of care, (2) breach of that standard by defendant, (3) injury, and (4) proximate causation between the alleged breach and the injury. Failure to prove any one of these elements is fatal." *Wischmeyer v Schanz*, 449 Mich 469, 484; 536 NW2d 760 (1995) (citations omitted).

With respect to the standard of care for a specialist, "the plaintiff has the burden of proving that in light of the state of the art existing at the time of the alleged malpractice" that the defendant "failed to provide the recognized standard of practice or care within that specialty as reasonably applied in light of the facilities available in the community or other facilities reasonably available under the circumstances . . . ." MCL 600.2912a(1)(b). The standard of care applicable to a specialist in a medical malpractice action is "that of a reasonable specialist practicing medicine in the light of present day scientific knowledge." *Naccarato v Grob*, 384 Mich 248, 254; 180 NW2d 788 (1970).

The admissibility of expert testimony on the standard of care in a medical malpractice case is also subject to MCL 600.2169(1), which provides, in pertinent part:

> In an action alleging medical malpractice, a person shall not give expert testimony on the appropriate standard of practice or care unless the person is licensed as a health professional in this state or another state and meets the following criteria:
>
> (a) If the party against whom or on whose behalf the testimony is offered is a specialist, specializes at the time of the occurrence that is the basis for the action in the same specialty as the party against whom or on whose behalf the testimony is offered. However, if the party against whom or on whose behalf the testimony is offered is a specialist who is board certified, the expert witness must be a specialist who is board certified in that specialty.
>
> (b) Subject to subdivision (c), during the year immediately preceding the date of the occurrence that is the basis for the claim or action, devoted a majority of his or her professional time to either or both of the following:
>
> (*i*) The active clinical practice of the same health profession in which the party against whom or on whose behalf the testimony is offered is licensed and, if that party is a specialist, the active clinical practice of that specialty.
>
> (*ii*) The instruction of students in an accredited health professional school or accredited residency or clinical research program in the same health profession in which the party against whom or on whose behalf the testimony is offered is licensed and, if that party is a specialist, an accredited health professional school or accredited residency or clinical research program in the same specialty.

Defendant Dr. Braver is a specialist in family practice medicine. Therefore, only another specialist in family practice medicine is qualified to provide testimony regarding the standard of

care that he required in treating plaintiff. MCL 600.2169(1)(a). It is undisputed that Dr. Lam did not practice medicine for the one-year period before the alleged malpractice in December 2015. Therefore, the admissibility of Dr. Lam's testimony depended on whether plaintiff could satisfy the requirements of MCL 600.2169(1)(b)(*ii*) by demonstrating that during the year immediately preceding the alleged malpractice, Dr. Lam devoted a majority of her professional time to the instruction of students in family practice medicine. Plaintiff fails to do this.

At her deposition, Dr. Lam testified that she was an assistant professor in the Department of Primary Care at the Touro College of Osteopathic Medicine ("Touro") from July 2014 to December 2016. When asked if she taught a family medicine course, she replied, "At Touro, no." Dr. Lam testified that she taught a physical diagnosis course for first-year students and a primary care skills class for second-year students. She stated "that courses for first-and second-year medical students are core curriculum general studies," which she described as "preclinical studies" covering the "basic sciences." In the third and fourth years, the students had "general rotations throughout internal medicine, pediatrics, ambulatory medicine, general surgery, OB/GYN and psychiatry." The fourth year had more elective courses for students to study the subjects in which they were interested.

Plaintiff argues that Dr. Lam's courses at Touro came within the purview of family practice medicine. She suggests that defendants' argument is based on the unreasonable assumption that Dr. Lam's courses did not involve family practice medicine merely because the term "family practice" did not appear in the course title. Plaintiff attempted to establish that Dr. Lam's courses constituted instruction of family practice medicine with an affidavit in which Dr. Lam averred that "the physical diagnosis course and the primary care skills course are within the practice of family medicine." She stated that she "consider[ed] then, and I consider now, the classes I taught at Touro to be critical within the purview of the practice of family medicine."

"[A] witness is bound by his or her deposition testimony, and that testimony cannot be contradicted by affidavit in an attempt to defeat a motion for summary disposition." *Casey v Auto Owners Ins Co*, 273 Mich App 388, 396; 729 NW2d 277 (2006). Dr. Lam's attempt to characterize her 2015 courses at Touro as falling "within the purview of the practice of family medicine" contradicted her deposition testimony that first- and second-year classes are "basic sciences" and "core curriculum" before students have "general rotations throughout internal medicine, pediatrics, ambulatory medicine, general surgery, OB/GYN and psychiatry" in the third and fourth years, and elective specialty courses in the fourth year. The courses Dr. Lam taught were generally applicable to all osteopathic practitioners, and therefore, were not courses in the specialty of family practice. Indeed, when directly asked if she taught any family medicine course at Touro, Dr. Lam unequivocally answered "no."

Accordingly, the trial court did not err by ruling that Dr. Lam was not qualified to testify as a standard-of-care expert in the specialty of family practice medicine.

### III. REQUEST TO SUBSTITUTE STANDARD-OF-CARE WITNESS

Plaintiff also argues that the trial court erred by denying her request to amend her witness list to add a new standard-of-care witness after Dr. Lam was disqualified. We disagree with plaintiff.

The trial court's decision whether to grant a party's request to add an expert witness is reviewed for an abuse of discretion. *Tisbury v Armstrong*, 194 Mich App 19, 20; 486 NW2d 51 (1991). "An abuse of discretion occurs when a circuit court chooses a result that falls outside the range of reasonable and principled outcomes." *Lenawee Co*, 301 Mich App at 162.

Plaintiff maintains that her request to amend her witness list to add a new standard-of-care expert to replace Dr. Lam was reasonable in view of the trial court's delay in deciding defendants' motions and her inability to prevail without a standard-of-care expert, and because defendants would not have been unfairly prejudiced by the amendment.

Plaintiff emphasizes that a trial date had not yet been set, and that the trial court failed to explain its delay in deciding defendants' motions. Plaintiff cites *Tisbury*, 194 Mich App at 20, in support of her argument that the trial court failed to consider factors related to the fairness of its decision. Unlike the situation before us, in *Tisbury*, the trial court granted the defendant's motion for summary disposition because the plaintiffs did not have an expert, and thus were unable to satisfy their burden of proof. *Id*. In *Tisbury*, the trial court previously had denied the plaintiffs' motions for an adjournment and to amend their witness list. *Id*. This Court held that the trial court abused its discretion by denying the plaintiffs the opportunity to add a new expert witness because the plaintiffs "provided an adequate explanation for the absence of their expert witness, and we do not believe any prejudice would have resulted if their motions had been granted." *Id*. at 21. This Court remarked that "[t]he original expert witness had not yet been deposed and there would not necessarily have been any effect on mediation." *Id*. There was "no indication on the record that the trial had been repeatedly postponed because of a lack of diligence on plaintiffs' part." *Id*. This Court stated that it was "significant that the court's decision on plaintiffs' motions put an end to this lawsuit. Given the policy of this state favoring the meritorious determination of issues, . . . we do not believe that the drastic remedy of summary disposition is appropriate in this case." *Id*. Thus, the factual scenario does not bear any resemblance to the record before us where plaintiff had retained an expert and that expert had been deposed.

Plaintiff argues that the trial court's denial of her request to amend her witness list is analogous to a court's decision to preclude a party from presenting witnesses as a sanction for failing to timely file a witness list. In *Duray Dev, LLC v Perrin*, 288 Mich App 143; 792 NW2d 749 (2010), this Court reviewed the trial court's sanction against a defendant who failed to timely file a witness list. This Court noted that the trial court had discretion to impose sanctions against a party for noncompliance with the court's scheduling order. *Id*. at 164. Precluding the party from calling witnesses was a possible sanction, but "[d]isallowing a party to call witnesses can be a severe punishment, equivalent to a dismissal." *Id*. This Court stated:

> But that proposition does not mean that disallowing witnesses is *always* tantamount to a dismissal. Nor does it mean that a trial court cannot impose such a sanction even if it is equivalent to a dismissal. Because the decision is within the trial court's discretion, caselaw mandates that the trial court consider the circumstances of each case to determine if such a drastic sanction is appropriate. The record should reflect that the trial court gave careful consideration to the factors involved and considered all of its options in determining what sanction was just and proper in the context of the case before it. Relevant factors can include, but are not limited to,

-5-

(1) whether the violation was wilful or accidental; (2) the party's history of refusing to comply with discovery requests (or refusal to disclose witnesses); (3) the prejudice to the defendant; (4) actual notice to the defendant of the witness and the length of time prior to trial that the defendant received such actual notice; (5) whether there exists a history of plaintiff's engaging in deliberate delay; (6) the degree of compliance by the plaintiff with other provisions of the court's order; (7) an attempt by the plaintiff to timely cure the defect; and (8) whether a lesser sanction would better serve the interests of justice. This list should not be considered exhaustive.

The trial court should also determine whether the party can prove the elements of his position based solely on the parties' testimony and any other documentary evidence. [*Duray Dev*, 288 Mich App at 164-165 (cleaned up).]

This Court concluded that the trial court failed to consider these factors and failed to consider "all of its options in determining what sanction was just and proper in the context of the case before it." *Id*. at 165.

Plaintiff's reliance on *Duray Dev* is misplaced. That case involved discovery sanctions, in contrast to this case in which a party's choice of an expert witness is not qualified to provide the testimony that the party needs to prevail. A trial court's decision regarding a witness's qualification as an expert and whether to allow replacement of a disqualified expert is not equivalent to precluding a witness from testifying as a sanction for untimely discovery. Both decisions may result in defeating a plaintiff's claims, but only in the former situation are the claims defeated because of a lack of admissible and substantive evidence. Moreover, in *Duray Dev*, plaintiff had not yet named a potential standard-of-care expert. Discovery had already been completed, but would have to be reopened if a new expert were allowed, and new motions in limine and dispositive motions would have to be permitted.

Plaintiff emphasizes that a trial date had not yet been set in the matter before us and that neither party was responsible for the delay in deciding defendants' motions. However, discovery had already closed before defendants filed their motions here, and the facts plaintiff cites still do not bring the trial court's decision outside of the range reasonable and principled outcomes. Moreover, the delay in deciding defendants' motions gave plaintiff time to plan an alternative strategy if defendants' motion to strike Dr. Lam was granted but, apparently, she did not avail herself of this opportunity.

Under these circumstances, the trial court did not abuse its discretion by denying plaintiff's request to amend her witness list to name a new standard-of-care expert.

IV. CAUSATION

Plaintiff argues that the trial court erred by ruling that Dr. Bader's causation testimony was inadmissible and granting summary disposition for defendants on this basis. We disagree.

The trial court's decision on a motion for summary disposition is reviewed de novo. *Heaton v Benton Constr Co*, 286 Mich App 528, 531; 780 NW2d 618 (2009). A motion under

MCR 2.116(C)(10) tests the factual sufficiency of a claim. *Pontiac Police & Fire Retiree Prefunded Group Health & Ins Trust Bd of Trustees v Pontiac No 2*, 309 Mich App 611, 617-618; 873 NW2d 783 (2015). When deciding a motion for summary disposition under MCR 2.116(C)(10), a reviewing court considers the pleadings, affidavits, depositions, admissions, and other documentary evidence submitted by the parties in a light most favorable to the nonmoving party. *Corley v Detroit Bd of Ed*, 470 Mich 274, 278; 681 NW2d 342 (2004). Summary disposition should be granted when "there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *Id*. A trial court's decision regarding the admissibility of expert testimony is reviewed for an abuse of discretion. *Lenawee Co*, 301 Mich App at 161.

"In an action alleging medical malpractice, the plaintiff cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the opportunity was greater than 50%." MCL 600.2912a(2). "Thus, to recover for the loss of an opportunity to survive or an opportunity to achieve a better result, a plaintiff must show that had the defendant not been negligent, there was a greater than fifty percent chance of survival or of a better result." *Dykes v William Beaumont Hosp*, 246 Mich App 471, 477; 633 NW2d 440 (2001).

In medical malpractice cases, expert testimony is required to establish the applicable standard of care and to demonstrate a breach of that standard. *Gonzalez v St John Hosp & Med Ctr* (*On Reconsideration*), 275 Mich App 290, 294-295; 739 NW2d 392 (2007). Expert testimony may not be based on mere speculation, and there "must be facts in evidence to support the opinion testimony of an expert." *Teal v Prasad*, 283 Mich App 384, 395; 772 NW2d 57 (2009). The admission of expert testimony is governed by MRE 702 and MCL 600.2955. See *Elher v Misra*, 499 Mich 11, 22; 878 NW2d 790 (2016).

MRE 702 provides:

If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

MCL 600.2955 provides:

(1) In an action for the death of a person or for injury to a person or property, a scientific opinion rendered by an otherwise qualified expert is not admissible unless the court determines that the opinion is reliable and will assist the trier of fact. In making that determination, the court shall examine the opinion and the basis for the opinion, which basis includes the facts, technique, methodology, and reasoning relied on by the expert, and shall consider all of the following factors:

-7-

(a) Whether the opinion and its basis have been subjected to scientific testing and replication.

(b) Whether the opinion and its basis have been subjected to peer review publication.

(c) The existence and maintenance of generally accepted standards governing the application and interpretation of a methodology or technique and whether the opinion and its basis are consistent with those standards.

(d) The known or potential error rate of the opinion and its basis.

(e) The degree to which the opinion and its basis are generally accepted within the relevant expert community. As used in this subdivision, "relevant expert community" means individuals who are knowledgeable in the field of study and are gainfully employed applying that knowledge on the free market.

(f) Whether the basis for the opinion is reliable and whether experts in that field would rely on the same basis to reach the type of opinion being proffered.

(g) Whether the opinion or methodology is relied upon by experts outside of the context of litigation.

(2) A novel methodology or form of scientific evidence may be admitted into evidence only if its proponent establishes that it has achieved general scientific acceptance among impartial and disinterested experts in the field.

(3) In an action alleging medical malpractice, the provisions of this section are in addition to, and do not otherwise affect, the criteria for expert testimony provided in section 2169.

The trial court "may admit evidence only once it ensures, pursuant to MRE 702, that expert testimony meets that rule's standard of reliability." *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 782; 685 NW2d 391 (2004). "This gatekeeper role applies to *all stages* of expert analysis. MRE 702 mandates a searching inquiry, not just of the data underlying expert testimony, but also of the manner in which the expert interprets and extrapolates from those data." *Id.* at 782.

The trial court analyzed defendants' summary disposition motion from two perspectives: (1) whether Dr. Bader could provide admissible expert opinion testimony if whether Dr. Braver had appropriately followed up on the 2015 CT scan, plaintiff's pancreatic cancer would have been timely treated and resulted in a more favorable outcome and prognosis; and (2) whether plaintiff could prove that she did not have metastasis to the liver in 2015, and that the spread of cancerous cells to the liver could have been prevented but for Dr. Braver's malpractice in 2015. With respect to the first perspective, the trial court concluded:

There is no genuine issue of material fact that the cancer was in the pancreas 2015 and it grew larger, the extent of which was measured by a comparison of the two scans, the 2015 missed scan and the 2017 scan. The treatment and

consequences of it are not in issue as there is no genuine issue of material fact as to it, as evidence by the agreement of the experts, the deferral of plaintiff's expert to the treating physicians and the treating physicians' testimony the growth was indolent and the treatment of it not effected nor changed by the year and a half delay. The issue of proximate cause is undisputed.

The trial court summarized Dr. Bader's expert opinion as follows:

Bader's opinion is that a person with a single metastasis (i.e. to the pancreas alone) has a better than 50% chance of a five-year survival but that a person, like plaintiff, who had multiple metastasis (to the pancreas and the liver) does not. That is, since there was one organ involved in the 2015 renal cell carcinoma metastasis, to the pancreas, and the 2017 showed metastasis to the liver and the pancreas, not just the pancreas, plaintiff has a reduced outcome for recovery.

The trial court excluded this opinion because Dr. Bader failed to demonstrate its scientific validity. The article that plaintiff attached to her response to defendants' summary disposition motion did not corroborate Dr. Bader's opinion that the appearance of a second metastasis in the June 2017 CT scan indicated a sharp reduction in the likelihood of five-year survival. Thus, the trial court found plaintiff's theory fatally flawed. The opinion that plaintiff lost an opportunity to achieve a 50 percent or greater likelihood of a more favorable outcome because of the 18-month delay between the two CT scans did not meet the requirements for admissibility in MCL 600.2955 as it was unsupported by any indicia of reliability. Plaintiff disputes the trial court's conclusion, but her argument is based mainly on an analysis of whether a question of fact exists, with little analysis of scientific literature cited by Dr. Bader in support of her conclusion.

Dr. Bader testified in his deposition that his opinion was supported by an article posted on the UptoDate website, but he did not produce the article at the time of his deposition and he had difficulty identifying it. When asked the title of the article, he replied, "It is renal cell carcinoma. There may be some detailed modifier there, but I don't remember." He testified regarding the 2017 CT finding of two locations of metastasis:

*Q*. So if we go to June 2, 2017, there are two metastatic lesions, correct?

*A*. Right.

\* \* \*

*Q*. Are you aware of any literature that equates to, and I am going, actually, to your number 12 here, it says that, "In a situation as this, the prognosis for a solitary metastasis as opposed to multiple metastasis is considerably better," correct?

*A*. Correct.

*Q*. Have you seen any literature in which it talks about the solitary metastasis but also equates it to also a limited number of distant metastasis?

*A.* Oligo; in other words, are there survival statistics for people with more than one metastatic site?

*Q.* Correct. You made a statement in your affidavit with respect to solitary mets.

Is there literature that you are aware of that also discusses limited distance?

*A.* With limited but multiple mets, the five-year overall survival is about 29 percent. It is a – solitary mets is about 55 percent.

*Q.* So I'm sorry. So limited, which is basically two to what?

*A.* It's two to several, but they can't be too big and they can't be in bad places.

*Q.* And she was limited in June of 2017?

*A.* Yes.

*Q.* Okay. And you said that survival rate is what?

*A.* 29.

*Q.* Five year?

*A.* Five-year overall.

*Q.* And you said the solitary is 50?

*A.* About 55.

*Q.* And where was this, all in the up-to-date, or somewhere else?

*A.* All in the up-to-date.

Dr. Bader testified that if plaintiff had the solitary pancreatic metastasis treated in 2015, the five-year overall survival rate was 73 percent, or "three chances out of four of never developing another metastasis." In 2015, plaintiff's metastatic cancer "only seeded to the pancreatic area by December 2015." Dr. Bader stated, "[Y]ou got a negative CAT scan in '15 and a positive CAT scan in '17, so, plus that thing, pancreatic lesion, had been around a long time. So I think it is more likely than not that it had no[t] seeded beyond the pancreas in . . . 2015." However, he admitted that he was not certain.

Plaintiff later submitted the UptoDate article on which Dr. Bader relied, which was entitled *Role of surgery in patients with metastatic renal cell carcinoma* (October 2019) ("*Role of Surgery*"). The *Role of Surgery* article discusses treatment rates for patients with metastatic renal

cell carcinoma (RCC) who received "surgical resection of metastatic foci," or "metastasectomy, which is "a treatment option that can yield long-term disease-free survival." The study selected 278 patients "with recurrent RCC in which 51 percent underwent removal of all of their metastatic disease with curative intent, 25 percent underwent partial resection of their metastatic disease, and 24 percent were treated without surgery." The metastases occurred "most frequently resected from the lung, brain, bone, and soft tissue." The article indicates that "resections of solitary metachronous liver metastases are possible, although the morbidity may be high." In selected patients, "two-year survival is greater than 50 percent." In a paragraph regarding pancreatic metastases, plaintiff underlined the following passages:

> Patients with pancreatic metastases seem to have a better prognosis, which may be a result of a more indolent biology. In addition, patients who present with pancreatic metastases also respond better to targeted agents, although the reason for this is unknown. A systematic literature review of 384 patients with RCC metastases to the pancreas managed with (n = 321) or without (n = 73) metastasectomy revealed five-year overall survivals of 73 and 14 percent respectively. The postoperative in-hospital mortality associated with pancreatic resection was 2.8 percent. The presence of extrapancreatic RCC metastases was associated with worse disease-free survival, and symptomatic metastases were associated with worse overall survival. Surprisingly, the size of the largest tumor resected, number of pancreatic metastases, type of pancreatic resection, and interval from diagnosis of RCC to pancreatic metastasis were not predictive of survival.

The underlined text does not corroborate Dr. Bader's opinion that plaintiff's chances for five-year survival dropped from 73 percent to 29 percent between December 2015 and June 2017. The 73 percent figure stated in the article is not related to a comparison of single-metastasis to multiple metastasis patients, or a comparison of success rates correlated to timeliness of diagnosis and treatment. Nothing in the article relates to Dr. Bader's opinion.

Plaintiff argues that the difference of opinion between Dr. Bader and the defense experts is a matter for the jury to decide, but this argument overlooks the trial court's gatekeeping role in determining the admissibility of expert testimony. Dr. Bader's testimony failed to establish that his opinion regarding plaintiff's lost opportunity for a more favorable outcome was subjected to scientific testing and replication, or subjected to peer review publication. MCL 600.2955(1)(a)-(b). His testimony also fails to show the "degree to which the opinion and its basis are generally accepted within the relevant expert community." MCL 600.2955(1)(e). He did not demonstrate that "the basis for the opinion is reliable and whether experts in that field would rely on the same basis to reach the type of opinion being proffered." MCL 600.2955(1)(f). There is no evidence related to the factors in MCL 600.2955(1)(c) ("existence and maintenance of generally accepted standards governing the application and interpretation of a methodology or technique") or (1)(d) ("known or potential error rate of the opinion and its basis"). Nor is there any indication in the record that Dr. Bader's opinion "is relied upon by experts outside of the context of litigation." MCL 600.2955(1)(g). Therefore, the trial court did not err by excluding Dr. Bader's opinion that failure to timely follow up with the 2015 CT scan cost plaintiff the opportunity for a better outcome.

Plaintiff argues that there is no factual dispute that the pancreatic cancer grew in the 18-month period and that liver cancer also appeared in the June 2017 CT scan. This is accurate, but it does not address the deficiency in plaintiff's proofs, namely, the lack of scientific support for Dr. Bader's lost-opportunity theory and causation. Additionally, the trial court found that Dr. Bader's testimony failed to support causation with respect to other unfavorable outcomes, such as proteinuria or the necessity of the Whipple procedure or Votrient, but plaintiff does not challenge these conclusions on appeal.

In sum, the trial court did not err by granting summary disposition because plaintiff failed to establish by scientifically acceptable evidence that she lost an opportunity for a more favorable outcome in the 18 months that elapsed between the December 2015 and June 2017 CT scans.

## V. DEFENDANTS' ISSUE ON CROSS-APPEAL

Defendants argue in their cross-appeal that the trial court should have also granted summary disposition on the ground that the factual basis for plaintiff's causation theory was speculative. However, because we have rejected each of plaintiff's claims of error and are affirming the trial court's dismissal of plaintiff's claims, it is unnecessary to address this issue.

## VI. CONCLUSION

The trial court did not err by ruling that Dr. Lam was not qualified to testify as a standard-of-care expert in the specialty of family practice medicine. The trial court also did not abuse its discretion by denying plaintiff's request to amend her witness list to name a new standard-of-care expert, and it did not err by granting summary disposition as plaintiff fails to establish, by scientifically acceptable evidence, that she lost an opportunity for a more favorable outcome. We affirm.

/s/ Kathleen Jansen
/s/ Mark J. Cavanagh
/s/ Michael J. Riordan